# EXHIBIT C

# CONTRACT BETWEEN
# THE NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES
# DIVISION OF MEDICAL ASSISTANCE
## AND
## PBH

### Contract # 2011-301

This Contract is hereby entered into by and between the North Carolina Department of Health and Human Services (the Department"), Division of  Medical Assistance ("DMA") and Piedmont Behavioral Healthcare Area Mental Health, Developmental Disabilities and Substance Abuse Authority doing business as PBH, (herein referred to as "PBH", "Contractor", or the "LME"), a political subdivision of the State of North Carolina, organized under North Carolina General Statute Chapter 122C, with its principal place of business at 245 Le Phillip Court in the city of Concord, County of Cabarrus, State of North Carolina. PBH shall be a Prepaid Inpatient Health Plan (PIHP) for Medicaid.  The Contractor's federal tax identification number is 56-1071669.

1.    **Contract Documents:**  This Contract consists of the following documents:

      (a)    This master document
      (b)    The General Terms and Conditions (Attachment A)
      (c)    The Scope of Work (SOW) (Attachment B)
      (d)    Background, Goals and Purpose (Attachment C)
      (e)    HIPAA Business Associate Addendum (Attachment D)
      (f)    Federal Certifications (Attachment E)
      (g)    Definition of Terms (Attachment F)
      (h)    Eligibility Groups (Attachment G)
      (i)    Schedule of Benefits (Attachment H)
      (j)    Scope of EPSDT Services (Attachment I)
      (k)    Statistical Reporting Measures (Attachment J)
      (l)    Requirements for Performance Improvement Projects (Attachment K)
      (m)    Grievance and Appeal Procedures (Attachment L)
      (n)    Network Provider Qualifications  (Attachment M)
      (o)    Capitation Rate-Setting Methodology (Attachment N)
      (p)    Business Transactions (Attachment O)
      (q)    Provider Manuals and Bulletins (Attachment P)
      (r)    Access/Availability Standards (Attachment Q)
      (s)    Guidelines for Stabilization Examination and Treatment for Emergency Medical Conditions and Women in Labor (Attachment R)
      (t)    Mixed Services Protocol (Attachment S)
      (u)    Financial Reporting Requirements (Attachment T)
      (v)    Medical Care Decisions and Advance Directives Brochure (Attachment U)
      (w)    Penalties (V)

      These documents constitute the entire agreement between the Parties and supersede all prior oral or written statements or agreements.

2.    **Effective Period:**  This Contract shall be effective on May 1, 2011 and shall terminate on March 31, 2013.

3.    **Contractor's Duties:**  The Contractor shall provide the services as described in Attachment B, Scope of Work.

4.    **Division's Duties:**  DMA will pay the Contractor in the manner and in the amounts specified in Attachment B, Scope of Work, and Attachment N.  The total amount paid by DMA to the Contractor under this Contract shall not exceed at $276,000,000.00 without a written amendment approved by the Parties.

5.    **Conflict of Interest Policy:**
      Contractor is not a nonprofit agency; therefore, a conflict of interest policy is not required.

6.    **Reporting Requirements:**
      DMA has determined that this is a contract for purchase of goods and services, and therefore is exempt from the reporting requirements of N.C.G.S. § 143C-6-22 & 23.

7.    **Payment Provisions:**
      Payment shall be made as described in the Scope of Work, Attachment B and in the Capitation Rate-Setting Methodology, Attachment N.

8.    **Contract Administrators:** All notices permitted or required to be given by one Party to the other and all questions about the Contract from one Party to the other shall be addressed and delivered to the other Party's Contract Administrator. The name, post office address, street address, telephone number, fax number, and email address of the Parties' respective initial Contract Administrators are set out below. Either Party may change the name, post office address, street address, telephone number, fax number, or email address of its Contract Administrator by giving timely written notice to the other Party.

      Pursuant to State Medicaid Director Letter 12/30/97 and 1932(d)(3) of the Social Security Act, the LME shall not contract with the state unless the LME has safeguards in place that are at least equal to Federal safeguards provided under section 27 of the Office of Federal Procurement Policy Act (41 U.S.C. 423).

**DMA's Contract Administrator for Program Issues:**

| IF DELIVERED BY US POSTAL SERVICE | IF DELIVERED BY ANY OTHER MEANS |
|---|---|
| Kathy Nichols, LCSW | Kathy Nichols, LCSW |
| Division of Medical Assistance | Division of Medical Assistance |
| Mail Service Center Number 2501 | Street Address 1985 Umstead Drive, Kirby Building |
| Raleigh, NC 27699 | Raleigh, NC Zip 27603-2001 |
| Telephone 919-855-4289 Fax 919-715-9451 Email kathy.nichols@dhhs.nc.gov | |

**DMA's Contract Administrator for Contract Issues:**

| IF DELIVERED BY US POSTAL SERVICE | IF DELIVERED BY ANY OTHER MEANS |
|---|---|
| Sherry Cannady, Contract Supervisor | Rachael Phillips, Contract Officer |
| Division of Medical Assistance | Division of Medical Assistance |
| Mail Service Center Number 2501 | Street Address 1985 Umstead Drive, Kirby Building |
| Raleigh, NC 27699 | Raleigh, NC Zip 27603-2001 |
| Telephone 919-855-4154 Fax 919-715-8468 Email sherry.cannady@dhhs.nc.gov | Telephone 919-855-4159 Fax 919-715-8468 Email rachael.phillips@dhhs.nc.gov |

**Contract Administrator For the Contractor:**

| IF DELIVERED BY US POSTAL SERVICE | IF DELIVERED BY ANY OTHER MEANS |
|---|---|
| Andrea J. Misenheimer<br>Medicaid Program Director<br>PBH<br>245 Le Phillip Ct, NE<br>Concord, NC, 28025<br><br>Telephone 704-721-7074<br>Fax 704-721-7010<br>Email andrea.misenheimer@pbhsolutions.org | Andrea J. Misenheimer<br>Medicaid Program Director<br>PBH<br>245 Le Phillip Ct NE<br>Concord, NC, 28025<br><br>Telephone 704-721-7074<br>Fax 704-721-7074<br>Email andrea.misenheimer@pbhsolutions.org |

**9.    Outsourcing:**

The Contractor certifies that it has identified to DMA all jobs related to the Contract that have been outsourced to other countries, if any. Contractor further agrees that it will not outsource any such jobs during the term of this Contract without providing notice to DMA.

**10.   Signature Warranty:**

The undersigned represent and warrant that they are authorized to bind their principals to the terms of this agreement.

**In Witness Whereof,** the Contractor, DMA, and the Department have executed this Contract in duplicate originals, with one original being retained by the Contractor and one being retained by DMA.

**PBH**

_____                               $4-5-2011$
Dean Vick, PBH, Board Vice-Chair                                Date

**ATTEST**

_____                               $4-5-2011$
Daniel R. Coughlin, CEO                                         Date

**[CORPORATE SEAL]**

**North Carolina Department of Health and Human Services**
**For Division of Medical Assistance**

_____                               $4-7-2011$
Craigan L. Grey, MD, MBA, JD, Director                          Date

Pursuant to 42 CFR 438.610(a), 42 CFR 438.610(b) and State Medicaid Director Letter 2/28/98, the LME may not knowingly have a relationship with the following:

a.  An individual who is debarred, suspended, or otherwise excluded from participating in procurement activities under the Federal Acquisition Regulation or from participating in non-procurement activities under regulations issued under Executive Order No. 12549 or under guidelines implementing Executive Order No. 12549.
b.  An individual who is an affiliate, as defined in the Federal Acquisition Regulation, of a person described above.

The relationship is described as follows:
a.  A director, officer or partner of the LME;
b.  A person with beneficial ownership of five percent (5%) or more of the LME's equity; or
c.  A person with an employment, consulting or other arrangement with the LME for the provision of items and services that are significant and material to the LME's obligations under its contract with the State.

## SECTION 2 - CONTRACTOR DESIGNATED AS A SINGLE PREPAID INPATIENT HEALTH PLAN (PIHP)

The North Carolina General Assembly, in Session Law 2001-437, designated the local mental health authorities as the "locus of coordination" for the provision of all publicly funded MH/DD/SA services. The law redirects the mission of the local authorities from providers of MH/DD/SA services to managers of services and requires that each local authority develop a business plan for the management, delivery, and oversight of public MH/DD/SA services. PBH is a local mental health authority, a multi-county political subdivision of the State of North Carolina established and operating in accordance with N.C.G.S. 122C-116, and is known as an "area authority". Given the newly defined role of the area authorities to manage all publicly funded MH/DD/SA services, it is logical and efficient to establish PBH as the single Prepaid Inpatient Health Plan pursuant to 42 C.F.R. 438.2, through which all mental health, substance abuse and developmental disability services shall be authorized for Medicaid in the five (5) county catchment area. This shall facilitate comprehensive and integrated service delivery as referenced in 45 C.F.R. 74.4. The counties included in the PBH catchment area are:

a.  Cabarrus;
b.  Davidson;
c.  Rowan;
d.  Stanly; and
e.  Union.

PBH has submitted information in the form of a Local Business Plan, prescribed by the North Carolina Department of Health and Human Services that fully describes its ability to meet the specifications of the Contract. PBH has provided detailed information on the Provider Network that has been developed under this prepaid health plan.

## SECTION 3 - ELIGIBILITY

### 3.1  Persons Eligible for Enrollment:

To be eligible to enroll in the PIHP established pursuant to this Contract, a person shall be a recipient in the North Carolina Medical Assistance (Medicaid) Program in one (1) of the aid categories listed below, and with county of residence for Medicaid eligibility purposes of Cabarrus, Davidson, Rowan, Stanly, or Union Counties.

a.  Individuals covered under Section 1931 of the Social Security Act (1931 Group, TANF/AFDC);
b.  Optional Categorically and Medically Needy Families and Children not in Medicaid deductible status (MAF);
c.  Blind and Disabled Children and Related Populations (SSI);
d.  Blind and Disabled Adults and Related Populations (SSI, Medicare);
e.  Aged and Related Populations (SSI, Medicare);
f.  Medicaid for the Aged (MAA);
g.  Medicaid for Pregnant Women (MPW);
h.  Medicaid for Infants and Children (MIC);
i.  Adult Care Home Residents (SAD, SAA);
j.  Foster Care Children;
k.  Participants in Community Alternatives Programs (CAP/DA,CAP-C, Innovations);
l.  Medicaid s living in ICF's-MR; or

h.  Submit reports, as outlined in this Contract as developed and amended by DMA;

i.  Submit ad-hoc reports requested by DMA at the times agreed upon by DMA and the LME;

j.  Submit financial reports as delineated in Attachment T, in accordance with Generally Accepted Accounting Principals (GAAP); and

k.  Upon request by DMA, provide clarification on financial reports/accounting issues that arise as a result of analysis by DMA.

The LME's annual financial reports shall be audited in accordance with Generally Accepted Auditing Standards (GAAS) by an independent Certified Public Accountant at the LME's expense. If determined applicable by DMA, the LME's annual financial reports shall also be audited in accordance with the Office of Management and Budget (OMB) Circular A-133 and OMB Circular A- 87. PBH's cost allocation plan shall be audited in accordance with OMB Circular A-122. PBH shall provide copies of the annual audit to DMA.

In addition to the annual audit, a final reconciliation shall be completed by the independent auditing firm that conducted the annual audit. The final reconciliation will make any required adjustments to estimates included in the annual audit. The final reconciliation shall be completed no sooner than six (6) months following the end of the State Fiscal Year on June 30.

The Claims Fund is comprised of unspent Medicaid service funds, and unspent Medicaid service funds that: (a) were set aside at the end of a fiscal year to cover outstanding claims from the previous fiscal year; and (b) were not needed to cover any outstanding claims. The final reconciliation shall verify the amount left in the Claims Fund at the end of the State Fiscal Year.

The annual financial audit and cost allocation plans are subject to annual independent verification and audit by a firm of DMA's choosing. Reimbursement for such audits shall be the responsibility of DMA.

## 6.2   Covered Services:

The LME shall provide to Enrollees covered under this Contract, through arrangements with others, all of the Covered Services identified in Attachment H. These services shall be provided in the manner set forth in this Contract. The amount, duration, and scope of these services shall be no less than the amount, duration, and scope of the same services furnished to Enrollees under fee-for-service Medicaid. The amount, duration, and scope of services must reasonably be expected to achieve the purpose for which the services are furnished. Covered services shall be Medically Necessary and shall be provided by a qualified Provider. The LME shall not arbitrarily deny or reduce the amount, duration, or scope of a required service solely because of diagnosis, type of illness or condition. LME Covered Services are defined in the State's Medicaid Provider Manuals, Bulletins and Clinical Coverage Policies, which are incorporated herein by reference. The LME shall have in effect mechanisms to ensure consistent application of review criteria for authorization decisions and shall consult with requesting Providers when appropriate. The LME may establish utilization management requirements that are different from State Plan requirements. The LME may place appropriate limits on a service on the basis of criteria such as medical necessity and for utilization control, provided that the services furnished can reasonably be expected to achieve their purpose.

The LME and its subcontractors shall have in place and follow written policies and procedures for processing requests for initial and continuing authorizations of services.

Attachment S specifies payment for mixed services; e.g., whether the LME or the Enrollee's Medical Plan pays for Medicaid covered services.

The LME shall provide all of the 1915(b)(3) services in the approved PBH waiver when the eligible enrollee meets the requirements and the service limitations are not exceeded. The LME is paid capitation rates based on the expected average utilization of the 1915(b)(3)services.

## 6.3   Emergency Medical Services:

In accordance with Section1932(b)(2) of the Social Security Act, as amended by the Balanced Budget Act (BBA) of 1997, the LME shall provide coverage for Emergency Behavioral Health Services consistent with the prudent layperson standard, as defined in Attachment F, Emergency Medical Condition. Such services shall be provided

15

**7.2   Annual External Quality Reviews**

Pursuant to 42 CFR 438.310 through 438.370, DMA will contract with an external quality review organization (EQRO) to conduct an annual independent external quality review (EQR). Three (3) activities are mandatory during these reviews: (1) determining PIHP compliance with federal Medicaid managed care regulations; (2) validation of performance measures produced by the PHIP; and (3) validation of performance improvement projects undertaken by the PIHP. CMS-published protocols shall be utilized by the organization conducting the EQR activities. In addition, based on the availability of encounter data, the EQRO shall conduct encounter data validation per the CMS protocols.

**7.3   Inspection and Monitoring:**

Pursuant to 42 C.F.R. 438.66, DMA will monitor the LME's enrollment practices and the LME's implementation of the LME's grievance and appeal procedures.

Pursuant to 42 C.F.R. 438.6(g), DMA, the United States Department of Health and Human Services, and any other authorized Federal or State personnel or their authorized representatives may inspect and audit any financial records of the LME or its subcontractors relating to the LME's capacity to bear the risk of potential financial losses.

Pursuant to 42 C.F.R. 434.6(a)(5), and as otherwise provided under this Contract, the Department, DMA, and any other authorized Federal or State personnel or their authorized representatives shall evaluate through inspection or other means, the quality, appropriateness and timeliness of services performed under this Contract.

**7.4   Utilization Management:**

**Utilization Management Program:**  The LME shall have a Utilization Management Program that is consistent with the requirements of 42 C.F.R. 456 and 42 C.F.R. 438, Subpart D. The Utilization Management Program shall include a written Utilization Management Plan which describes the mechanisms used to detect underutilization of services as well as overutilization.  The written Utilization Management Plan shall address procedures used by the LME to review and approve requests for medical services, and shall identify the clinical criteria used by the LME to evaluate the medical necessity of the service being requested.  The LME shall ensure consistent application of review criteria and shall consult with requesting providers when appropriate.  The LME shall conduct an annual appraisal that assesses the LME's adherence to the requirements of the Utilization Management Plan and identifies the need for changes in the Utilization Management Plan.

The LME shall have an information technology system that collects, stores, and retrieves the data necessary to perform the required utilization management functions.

**Practice Guidelines:**  The LME shall develop a Clinical Advisory Committee consisting of licensed Network Providers. Practice Guidelines shall be developed in consultation with this committee. Practice guidelines shall be based on valid and reliable clinical evidence (Evidence Based Practice) or a consensus of professionals in the field. Practice guidelines shall address the needs of Enrollees and shall be reviewed and updated periodically as appropriate and in accordance with changes and developments in clinical research. Practice Guidelines shall be disseminated to Providers and, upon request, to Enrollees. All utilization management decisions, Enrollee education decisions, coverage of services decisions, and all other decisions covered by the Practice Guidelines shall be consistent with the Practice Guidelines.

Requests for authorization to be admitted to, or to remain in, inpatient or intermediate care, shall be reviewed by behavioral health professionals, as defined in 42 C.F.R Part 456. Inpatient and intermediate care in an institution shall be approved by a physician or physician's assistant as required by 42 C.F.R. Part 456.

Requests for authorization to receive or to continue to receive, outpatient services, shall be reviewed by behavioral health professionals, as defined in 42 C.F.R Part 456. A denial of a request for outpatient services shall be made by a licensed clinician whose license is comparable to the license of the Provider requesting the service.

A decision to deny a service or to authorize a service in an amount, duration, or scope that is less than requested, shall be made by a health care professional who has appropriate clinical expertise in treating the Enrollee's condition or disease.

The LME's provider contracts shall require that each individual, group, and organizational Provider comply with all applicable federal, State, and LME requirements regarding:

28

a.   access to care:
b.   utilization review;
c.   clinical studies; and
d.   all other utilization management, Care Management, Quality Management and credentialing activities prescribed in 42 C.F.R. Parts 441 and 456.

The LME shall develop policies and procedures for monitoring provider compliance with these requirements.

THE LME SHALL NOT IMPLEMENT ANY UTILIZATION MANAGEMENT POLICIES OR PROCEDURES THAT PROVIDE INCENTIVES FOR UTILIZATION REVIEWERS TO DENY, LIMIT, OR DISCONTINUE MEDICALLY NECESSARY SERVICES TO ANY ENROLLEE. .

**Timeframes for Standard Decisions:** The LME shall issue a decision to approve or deny a service within fourteen (14) calendar days after it receives the request for services, provided that the deadline may be extended for up to fourteen (14) additional calendar days if:

a.   The Enrollee requests the extension; or
b.   The Provider requests the extension; and
c.   The LME justifies (to DMA upon request):

    1.   A need for additional information; and
    2.   How the extension is in the Enrollee's interest.

Notwithstanding the foregoing deadlines, the LME shall always issue a decision to approve or deny a service as expeditiously as the Enrollee's health condition requires.

**Timeframes for Expedited Decisions:** In those cases in which a Provider indicates, or the LME determines, that adherence to the standard timeframe could seriously jeopardize an Enrollee's life or health or ability to attain, maintain, or regain maximum function, the LME shall issue a decision to approve or deny a service within three (3) calendar days after it receives the request for services, provided that the deadline may be extended for up to fourteen (14) additional calendar days if:

a.   The Enrollee requests the extension; or
b.   The Provider requests the extension; and
c.   The LME justifies (to DMA upon request):

    1.   A need for additional information; and
    2.   How the extension is in the Enrollee's interest.

**Notice of Termination, Suspension or Reduction of Services:** When the LME decides to terminate, suspend, or reduce a previously authorized Medicaid-covered service, the LME shall mail notice of the action at least ten (10) days before the effective date of the action. The LME may shorten the period of advance notice to five (5) days if:

a.   The LME has facts indicating that action should be taken because of probable fraud by the recipient; and
b.   The facts have been verified, if possible, through secondary sources.

Notices shall be sent to the Enrollee in accordance with 42 C.F.R. 438.210 (c). See Attachment L, Grievance and Appeal Procedures.

**Service Authorization:** The LME shall define service authorization in a manner that at least includes a managed care enrollee's request for the provision of a service as required by 42 CFR 431.201.

## 7.5   Grievances and Appeals:

The LME shall adopt and implement grievance and appeal procedures that meets the requirements of 42 C.F.R. 438.228; 42 C.F.R. 438 Subpart F; and Contract Attachment L.  The grievance and appeal procedures must:

a.   Be approved in writing by DMA;

29

b.    Provide for prompt resolution of Enrollee grievances and appeals; and
c.    Assure the participation of individuals with the authority to require the LME to take corrective action when appropriate.

The LME shall use grievance and appeal data for quality improvement and shall report Enrollee grievances and appeals to DMA by number, type, and outcome by no later than forty five (45) calendar days after the end of each quarter of the State fiscal year.

## 7.6    Credentialing:

Subject to DMA's prior review and written approval, the LME shall adopt and implement written policies and procedures governing the qualification, credentialing, re-credentialing, accreditation, and re-accreditation of its Network Providers. The LME shall maintain records of its qualification, credentialing, and accreditation activities in order to demonstrate its compliance with these policies and procedures. Upon request, the LME shall make its records available to DMA for inspection and copying during normal business hours. The LME's credentialing and accreditation criteria shall be consistent with State and Federal rules and regulations governing the subject behavioral health and medical professions. The LME shall routinely monitor the licensure, certification, registration, and accreditation status of its Network Providers.

If the LME declines to accept an individual Provider or Provider agency as a member of its Provider Network, it shall give the affected Provider written notice of the reasons for its decision.

The LME shall not be required to review the qualifications and credentials of Providers that wish to become Network Members if the Network has sufficient numbers of Providers with the same or similar qualifications and credentials to meet existing Enrollee demand.

The LME shall, at a minimum, consider the following information when deciding whether to re-accredit and re-credential a Network Provider:

a.    Data collected through the LME's Utilization Management Program;
b.    Data collected through the LME's Quality Management Program;
c.    Accreditation outcomes;
d.    Grievances procedure outcomes;
e.    Complaint logs;
f.    Enrollee satisfaction survey results; and
g.    The results from other quality improvement activities.

The LME shall apply these criteria consistently to all Providers.

**Insurance:**  The LME shall require all Network Providers to obtain and maintain:

a.    General Liability Insurance;
b.    Automobile Liability Insurance;
c.    Worker's Compensation Insurance;
d.    Employer's Liability Insurance; and
e.    Professional Liability Insurance;

in amounts that equal or exceed the limits established by the LME.  The LME shall review these insurance limits annually and revise them as needed.  The LME shall require all Network Providers to obtain coverage that cannot be suspended, voided, canceled or reduced unless the carrier gives thirty (30) days prior written notice to the LME.  The LME shall require Network Providers to submit certificates of coverage to the LME.  Upon DMA's request, the LME shall submit copies of these certificates to DMA.

## 7.7    Provider Selection:

The LME shall have written policies and procedures for the selection and retention of Network Providers. Qualification of Providers shall be conducted in accordance with the procedures delineated in Attachment M.  The LME shall not discriminate, solely on the basis of the Provider's license or certification, for the participation, reimbursement, or indemnification of any Provider who is acting within the scope of his or her license or certification under applicable State law.

In all contracts with health care professionals, the LME shall comply with the requirements of 42 C.F.R. 438.214 regarding the selection and retention of Providers, the credentialing and re-credentialing of Providers, and non-discrimination in the selection of Providers. The LME shall not discriminate against particular Providers that serve high-risk populations or specialize in conditions that require costly treatment. The LME shall not employ or contract with Providers excluded from participation in Federal health care programs under either Section 1128 or Section 1128A of the Social Security Act. The LME shall consult the United States Department of Health and Human Services, Office of the Inspector General's List of Excluded Individuals and Entities (LEIE), the Medicare Exclusion Databases (MED), and the Excluded Parties Listing System (EPLS) to ensure that Providers who are excluded from participation in Federal programs are not enrolled in the LME network.

The LME is not precluded from using different reimbursement amounts for different specialties or for different practitioners in the same specialty; or from establishing measures that are designed to maintain quality of services and control costs and are consistent with its responsibilities to Enrollees.

## 7.8    Provider Manual:

The LME shall develop, maintain, and distribute a Provider manual that provides information and education to Providers about the LME. This distribution may occur by making the manual available electronically on its website. DMA will have the right to review and approve the Provider manual prior to its release. The manual shall be updated at least annually. At a minimum, the Provider manual shall cover the areas listed below.

a.    Purpose and mission;

b.    Treatment Philosophy and Community Standards of Practice;

c.    Behavioral health Provider Network requirements, including: nondiscrimination, on-call coverage, credentialing, re-credentialing, access requirements, no-reject requirements, notification of changes in address, licensure requirements, insurance requirements, and required availability;

d.    Appointment access standards;

e.    Authorization, utilization review, and care management requirements;

f.    Care Coordination and discharge planning requirements;

g.    Documentation requirements, as specified in APSM 45-2 or as required by the Physician's Services Manual;

h.    Provider appeals process;

i.    Complaint investigation and resolution procedures;

j.    Performance improvement procedures, including at a minimum: Recipient satisfaction surveys; Provider satisfaction surveys; clinical studies; incident reporting; and outcomes requirements;

k.    Compensation and claims processing requirements, including required electronic formats, mandated timelines, and coordination of benefits requirements; and

l.    Patient rights and responsibilities.

The LME shall provide to Providers any and all training and technical assistance it deems necessary regarding administrative and clinical procedures and requirements, as well as clinical practices.

## 7.9    Health Information Systems:

The LME shall maintain a health information system that collects, analyzes, integrates, and reports data. At a minimum, the system shall provide information on utilization, grievances and appeals, and disenrollments for reasons other than loss of Medicaid eligibility.

## ATTACHMENT F

### DEFINITIONS

**Action:** The denial or limited authorization of a requested service, including the type or level of service; the reduction, suspension, or termination of a previously authorized service; the denial, in whole or in part, of payment for a service; the failure to provide services in a timely manner, as defined by the State; the failure of the LME to act within the timeframes provided in 42 C.F.R. 438.408(b). For a rural area resident with only one LME, the denial of a Medicaid Enrollee's request to obtain services outside the network:

    a.    From any other provider in terms of training, experience, and specialization) not available in the Network

    b.    From a provider not part of the network who is the main source of a service to the recipient—provided that the provider is given the same opportunity to become a participating provider as other similar providers. If the provider does not choose to join the Network or does not meet the qualifications, the Enrollee is given a choice of participating providers and is transitioned to a participating provider within 60 days.

    c.    Because the only plan or provider available does not provide the service because of moral or religious objections.

    d.    Because the Enrollee's provider determines that the recipient needs related services that would subject the recipient to unnecessary risk if received separately and not all related services are available within the network.

**Appeal:** A request for an administrative reconsideration of an action. An appeal is conducted and decided at the LME level.

**Best Practices:** Recommended practices, including Evidence Based Practices that consist of those clinical and administrative practices that have been proven to consistently produce specific, intended results.

**Capitation Payment:** The amount to be advanced monthly to the LME for each Potential Enrollee covered by the LME's Benefit Plan based on Eligibility Category, age, whether or not the Potential Enrollee receives services during the period covered by the payment.

**Catchment Area:** Geographic Service Area meaning a defined grouping of counties.

**C.F.R.:** Code of Federal Regulations

**Clean Claim:** A clean claim is a claim that can be processed without obtaining additional information from the provider of the services or from a third party. It does not include a claim under review for medical necessity, or a claim that is from a Provider that is under investigation by a governmental agency for fraud or abuse.

**CMS:** Centers for Medicare and Medicaid Services

**Concurrent Review:** A review conducted by the LME during a course of treatment to determine whether services meet Medical Necessity and quality standards and whether services should continue as prescribed or should be terminated, changed or altered.

**Contract Term:** The initial term of this Contract.

**Covered Services:** The services identified in Attachment K which the LME agrees to provide or arranges to provide to all enrollees pursuant to the terms of this Contract.

**Cultural Competency:** The understanding of the social, linguistic, ethnic, and behavioral characteristics of a community or population and the ability to translate systematically that knowledge into practices in the delivery of behavioral health services. Such understanding may be reflected, for example, in the ability to: identify and value differences; acknowledge the interactive dynamics of cultural differences; continuously expand cultural knowledge and resources with regard to populations served; collaborate with the community regarding service provisions and delivery; and commit to cross-cultural training of staff and develop policies to provide relevant, effective programs for the diversity of people served.

56

**DHHS:** The North Carolina Department of Health and Human Services

**Days:** Except as otherwise noted, refers to calendar days. "Working day" or "business day" means day on which DMA is officially open to conduct its affairs.

**Denial of Services:** A determination made by the LME (in response to a Provider's request for authorization to provide in-plan services of a specific duration and scope) which:

    a.    Disapproves the request completely; or

    b.    Approves provision of the requested service(s), but for a lesser scope or duration than requested by the provider; (an approval of a requested services which includes a requirement for a concurrent review by the LME during the authorized period does not constitute a denial); or

    c.    Disapproves provision of the requested service(s), but approves provision of an alternative service(s).

**Department:** The North Carolina Department of Health and Human Services

**Disenrollment:** Action taken by DMA to remove an Enrollee's name from the monthly Enrollment Report following DMA's determination that the Enrollee is no longer eligible for enrollment in the LME.

**DMA:** The Division of Medical Assistance

**DMH/DD/SAS:** The Division of Mental Health, Developmental Disabilities and Substance Abuse Services

**DSS:** The county Department of Social Services

**Emergency Medical Condition:** A medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in:

    a.    Placing the health of the individual (or with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy

    b.    Serious impairment to bodily functions, or

    c.    Serious dysfunction of any bodily organ or part.

**Emergency Services:** With respect to an , covered inpatient and outpatient services that:

    a.    Are furnished by a provider that is qualified to furnish such services; and

    b.    Are needed to evaluate or stabilize an emergency medical condition as defined above.

**Emergent Need (Mental Health):** A life threatening condition in which a person is suicidal, homicidal, actively psychotic, displaying disorganized thinking or reporting hallucinations and delusions that may result in harm to self or harm to others, and/or displaying vegetative signs and is unable to care for self.

**Emergent Need (Substance Abuse):** A life threatening condition in which the person is by virtue of their use of alcohol or other drugs, suicidal, homicidal, actively psychotic, displaying disorganized thinking or reporting hallucinations and delusions which may result in self-harm or harm to others, and/or is unable to adequately care for self without  supervision due to the effects of chronic substance abuse or dependence.

**Encounter Data:** A record of a Covered Service rendered by a provider to an Enrollee who is enrolled in the LME during the date of service. It includes all services for which the LME incurred any financial responsibility; in addition, it may include claims for reimbursement, which were denied by the LME.

**Enrollment:** Action taken by the DMA to add a Medicaid recipient's name to the monthly Enrollment Report following the receipt and approval by DMA of Medicaid Eligibility for a person living in the defined catchment area.

57

**Enrollees:** A Medicaid recipient that is currently enrolled in the LME's PIHP.

**Enrollment Period:** The time span during which a recipient is enrolled with a LME.

**Expanded Services:** Services included in Covered Services, which are in addition to the minimum coverage required by DMA and which the LME agrees to provide throughout the term of this Contract in accordance with the standards and requirements set forth in this Contract.

**Facility:** Any premises (a) owned, leased, used or operated directly or indirectly by or for the LME for purposes related to this Contract; or (b) maintained by a sub-contractor to provide services on behalf of the LME as part of this Contract.

**Fee-for-Service:** A method of making payment directly to health care providers enrolled in the Medicaid program for the provision of health care services to Recipients based on the payment methods set forth in the State Plan and the applicable policies and procedures of DMA.

**Fiscal Agent:** An agency that processes and audits Medicaid provider claims for payment and performs certain other related functions as an agent of DMA.

**Grievance:** An expression of dissatisfaction by or on behalf of an Enrollee about any matter other than an action, as "action" is defined in this section. The term is also used to refer to the overall system that includes grievances and appeals handled at the LME level and access to the State fair hearing process. (Possible subjects for grievances include, but are not limited to, the quality of care or services provided, and aspects of interpersonal relationships such as rudeness of a provider or employee, or failure to respect the Enrollee's rights).

**Grievance and Appeal Procedure:** The written procedures pursuant to which Enrollees may express dissatisfaction with the provision of services by the LME and the methods for resolution of Enrollee grievances and appeals by the LME

**Hearing:** The State fair hearing process, during which a contested Medicaid case is filed with the Office of Administrative Hearings, and an administrative law judge conducts a formal hearing in which parties affected by an action or an intended action of DMA will be allowed to present testimony, documentary evidence and argument as to why such action should or should not be taken.

**Health Plan Employer Data and Information Set (HEDIS):** is a set of standardized performance measures designed to reliably compare the performance of managed health care plans.

**Individuals with Disabilities Education Act (IDEA):** A federal law (PL 99-457) which requires special services for children with special needs from birth to age twenty one (21) years.

**Innovations Waiver:** The Section 1915(c) Home and Community Based Services Waiver that operates in the five-county area covered by this Contract. The Innovations Waiver replaces the Community Alternatives Program for Persons with Mental Retardation and Developmental Disabilities (CAP-MR/DD) in the Piedmont counties.

**In-Plan Services:** Services which are included in the behavioral health capitation rate and are the payment responsibility of the LME.

**Insolvency:** The inability of the LME to pay its obligations when they are due.

**LME:** Local Management Entity, a local political subdivision of the state of North Carolina as established under General Statute 122C.

**Medicaid Identification (MID) Card:** The Medical Assistance Eligibility Certification card issued monthly by DMA to Recipients.

**Medicaid for Infants and Children (MIC):** A program for medical assistance for children under the age of nineteen (19) whose countable income falls under a specific percentage of the Federal Poverty Limit and who are not already eligible for Medicaid in another category.

**Medicaid for Pregnant Women (MPW):** A program for medical assistance for pregnant women whose income falls under a specified percentage of the Federal Poverty Limit and who are not already eligible in another category.

58

**Medical Assistance Program (Medicaid):** DMA's program to provide medical assistance to eligible citizens of the State of North Carolina, established pursuant to Chapter 58, Articles 67 and 68 of the North Carolina General Statutes and Title XIX of the Social Security Act, 42 U.S.C. 1396 et. seq.

**Medical Record:** A single complete record, maintained by the Provider of services, which documents all of the treatment, plans developed for, and behavioral health services received by, an Enrollee.

**Medically Necessary Treatment:** Medically necessary treatment means those procedures, products and services that are provided to Medicaid recipients (excluding Qualified Medicare Beneficiaries) that are:

 a. Necessary and appropriate for the prevention, diagnosis, palliative, curative, or restorative treatment of a mental health or substance abuse condition;

 b. Consistent with Medicaid policies and National or evidence based standards, North Carolina Department of Health and Human Services defined standards, or verified by independent clinical experts at the time the procedures, products and the services are provided;

 c. Provided in the most cost effective, least restrictive environment that is consistent with clinical standards of care;

 d. Not provided solely for the convenience of the recipient, recipient's family, custodian or provider;

 e. Not for experimental, investigational, unproven or solely cosmetic purposes;

 f. Furnished by or under the supervision of a practitioner licensed (as relevant) under State law in the specialty for which they are providing service and in accordance with Title 42 of the Code of Federal Regulations, the Medicaid State Plan, the North Carolina Administrative Code, Medicaid medical coverage policies, and other applicable Federal and state directives;

 g. Sufficient in amount, duration and scope to reasonably achieve their purpose, and

 h. Reasonably related to the diagnosis for which they are prescribed regarding type, intensity, duration of service and setting of treatment.

Within the scope of the above guidelines, medically necessary treatment shall be designed to:

 a. Be provided in accordance with a person centered service plan which is based upon a comprehensive assessment, and developed in partnership with the individual (or in the case of a child, the child and the child's family or legal guardian) and the community team;

 b. Conform with any advanced medical directive the individual has prepared;

 c. Respond to the unique needs of linguistic and cultural minorities and furnished in a culturally relevant manner; and

 d. Prevent the need for involuntary treatment or institutionalization.

**Medicaid Management Information System (MMIS):** The mechanized claims processing and information retrieval system used by state Medicaid agencies and required by federal law.

**Network Provider:** A provider of behavioral health services that meets the LME's criteria for enrollment, credentialing and/or accreditation requirements and has signed a written agreement to provide services.

**Out-of-Area Services:** In-plan behavioral health services provided to an Enrollee while the Enrollee is outside the catchment area.

**Out-of-Plan Services:** Health care services, which the LME is not required to provide under the terms of this Contract. The services are Medicaid covered services reimbursed on a fee-for-service basis.

**Out-of-Network Provider:** Any person or entity providing services who does not have a written provider agreement with the LME and is therefore not included or identified as being in the LME's Provider Network.

**Potential Enrollee:** A Medicaid recipient who is subject to mandatory enrollment.

**Prepaid Inpatient Health Plan (PIHP):** An entity that provides medical services to Enrollees under contract with the State agency, and on the basis of prepaid capitation payments, or other payment arrangements that do not use State plan payment rates; provides arranges for, or otherwise has responsibility for the provision of any inpatient hospital or institutional services for its Enrollees; and does not have a comprehensive risk contract. (42 C.F.R. 438.2)

**Prior Authorization:** The act of authorizing specific services before they are rendered.

**Provider:** Any person or entity providing behavioral health services.

**Provider Network:** The agencies, professional groups, or professionals under contract to the LME that meet LME standards and that provide authorized Covered Services to eligible and enrolled persons.

**Qualified Professional:** Any individual with appropriate training or experience as specified by the North Carolina General Statutes or by rule of the North Carolina Commission on Mental Health, Developmental Disabilities and Substance Abuse Services in the fields of mental health or developmental disabilities or substance abuse treatment or habilitation, including physicians, psychologists, psychological associates, educators, social workers, registered nurses, certified fee-based practicing pastoral counselors, and certified counselors. (N.C.G.S. 122C-3)

**Recipient:** An Enrollee who is receiving services.

**Reconsideration Review:** An informal hearing before a DMA Hearing Officer wherein a provider may dispute an LME decision regarding reimbursement rates, payment denials, disallowances, payment adjustments, and cost settlement disallowances and adjustments to that provider. The decision of the Hearing Officer is subject to appeal through the Office of Administrative Hearings. (10 NCAC 22J)

**Risk Contract:** A contract under which the contractor: 1) assumes risk for the cost of the services covered under the contract; and 2) incurs loss if the cost of furnishing the services exceeds the payments under the contract. This contract is a risk contract because the LME assumes that risk that the cost of providing Covered Services to s may exceed the capitation rate paid by DMA.

**Routine Need (Mental Health):** A condition in which the person describes signs and symptoms resulting in impaired behavioral, mental or emotional functioning which has impacted the person's ability to participate in daily living or markedly decreased the person's quality of life.

**Routine Need (Substance Abuse):** A condition in which the person describes signs and symptoms consequent to substance use resulting in a level of impairment which can likely be diagnosed as a substance use disorder according to the current version of the Diagnostic and Statistical Manual.

**Service Management Record:** A record of Enrollee demographics, authorizations, referrals, actions and services billed by Network Providers.

**State:** The State of North Carolina

**State Plan:** The "State Plan" submitted under Title XIX of the Social Security Act, Medical Assistance Program for the State of North Carolina and approved by CMS.

**Subcontract:** An agreement which is entered into by the LME in accordance with Section 11.

**Subcontractor:** Any person or entity which has entered into a subcontract with the LME.

**Third Party Resource:** Any resource available to a Member for payment of expenses associated with the provision of Covered Services (other than those which are exempt under Title XIX of the Act), including but not limited to, insurers, tort-feasors, and worker's compensation plans.

**Treatment Planning Case management: (1)** The state must implement mechanisms to identify person with special health care needs to managed care organizations (MCO's). PIHP's and prepaid ambulatory health plans (PAHP's) as those persons are defined by the State. These identification mechanisms: (i) Must be specified in the States' quality improvement strategy in §438.202. (Ii) May use State staff, the State's enrollment broker, or the State's MCOs, PIHPs, PAHPs. Assessment. Each MCO, PIHP and PAHP must implement mechanisms to assess each Medicaid enrollee identified by the State (through the mechanism specified in paragraph (c)(1) of this section) and identified by the MCO, PIHP and PAHP by the State as having special health care needs in order to identify any ongoing special conditions of the enrollee that require a course of treatment of regular care monitoring. The assessment mechanisms must use appropriate health professionals. Treatment plans. If the State requires MCOs, PIHPs or PAHPs to produce a treatment plan for enrollees with special health care needs who are determined through the assessment to need a course of treatment or regular care monitoring, the treatment plan must be: (i) Developed by the enrollees primary care provider with enrollee participation and in consultation with any specialists caring for the enrollee. (ii) Approved by the MCO, PIHP or PAHP in a timely manner, if this approval is required by the MCO, PIHP or PAHP. (iii) In accord with any applicable State quality assurance and utilization review standards. Direct access to specialists. For enrollees with special health care needs determined through an assessment by appropriate health care professionals (consistent with §438.208 (c)(2)) to need a course of treatment or regular care monitoring, each MCO, PIHP and PAHP must have a mechanism in place to allow enrollees to directly access a specialist (for example, through a standing referral or an approved number of visits) as appropriate for the enrollee's condition and identified needs.

**Urgent Need (Mental Health):** A condition in which a person is not actively suicidal or homicidal; denies having a plan, means or intent for suicide or homicide but expresses feelings of hopelessness, helplessness or rage; has potential to become actively suicidal or homicidal without immediate intervention; displays a condition which could rapidly deteriorate without immediate intervention; and/or without diversion and intervention will progress to the need for emergent services and care.

**Urgent Need (Substance Abuse):** A condition in which the person is not imminently at risk of harm to self or others or unable to adequately care for self, but by virtue of their substance use is in need of prompt assistance to avoid further deterioration in the person's condition which could require emergency assistance.

**Utilization Management:** The process of evaluating the necessity, appropriateness, and efficiency of behavioral health care services against established guidelines and criteria.

**WFFA:** Work First for Family Assistance

**ATTACHMENT H**

**SCHEDULE OF BENEFITS**

**The LME shall provide the following services:**

1.  All Medicaid MH/DD/SA services described in clinical coverage policies 8A through 8E located on the DMA website at http://www.dhhs.state.nc.us/dma/

2.  Medicaid covered MH/DD/SA emergency room services

3.  Medicaid covered MH/DD/SA services provided by psychiatrists

4.  1915(c) HCBS waiver services as defined in the "Innovations" waiver at:
    http://www.ncdhhs.gov/dma/services/piedmont.htm

5.  Section 1915(b)(3) waiver services as defined in the 1915(b) MH/DD/SAS waiver at:
    http://www.ncdhhs.gov/dma/services/piedmont.htm

## ATTACHMENT L

### GRIEVANCE AND APPEAL PROCEDURES

The LME shall have an internal grievance and appeal system with written policies and procedures. The grievance and appeal system shall meet all regulatory requirements in 42 CFR Part 438 Subpart F, "Grievance System," and shall include a process for filing a grievance, filing an appeal, and accessing the State fair hearing system.

A grievance is an expression of dissatisfaction about matters involving the LME. Possible subjects for grievances include, but are not limited to, the quality of services provided through the LME, aspects of interpersonal relationships such as rudeness of a Network Provider or an employee of the LME, or failure by the LME or a Network Provider to respect the rights of an Enrollee.

An appeal is a request for an administrative reconsideration of an "action" taken by the LME. An appeal is conducted and decided at the LME level. "Action" is defined as:

a. The denial or limited authorization of a requested service (including the type or level of service);

b. The reduction, suspension, or termination of a previously authorized service;

c. The denial, in whole or in part, of payment for a service;

d. The failure to provide services in a timely manner. (The LME must ensure that appropriate services are available as stated in Section 6.5, Appointment Availability of this Contract); or

e. The failure of the LME to act within the timeframes in 42 CFR 438.408(b).

Enrollees may file a grievance or an appeal with the LME, either orally or in writing. However, an oral appeal must be followed by a written, signed appeal unless expedited resolution, as described in section G below, is requested.

Enrollees must exhaust the LME appeal process before requesting a State fair hearing.

### A. General Requirements of Grievance and Appeal System:

a) The LME must:

a. Provide Enrollees any reasonable assistance in completing forms and other procedural steps, including but not limited to, providing interpreter services and toll free numbers with TTY/TDD and interpreter capability;

b. Acknowledge receipt of each grievance and appeal;

c. Ensure that decision makers on grievances and appeals were not involved in previous levels of review or decision-making; and

d. Ensure that decision makers on grievances and appeals are health care professionals with clinical expertise in treating the member's condition or disease if any of the following apply:

i. an appeal of a denial based on lack of medical necessity;
ii. a grievance regarding the LME's denial of a request for an expedited review of an appeal;
iii. any grievance or appeal involving clinical issues;
iv. an appeal of a denial of a service authorization request; or
v. an appeal of a decision to authorize a service in an amount, duration or scope than is less than requested.

Pursuant to 42 C.F.R. 438.414 and 42 CFR 438.10(g), the LME shall provide the following information on grievance, appeal, and State fair hearing procedures and timeframes to all Providers and subcontractors at the time they enter into a contract. The LME shall also provide the following information to all Enrollees:

a. The Enrollee's right to a State fair hearing, how to obtain a hearing, and representation rules at a hearing;
b. The Enrollee's right to file grievances and appeals and their requirements and timeframes for filing;

c.　The availability of assistance in filing;
d.　The toll free numbers to file oral grievances and appeals; and
e.　The Enrollee's right to request continuation of benefits during an appeal or State fair hearing and that, if the LME's action is upheld in a hearing, the Enrollee may be liable for the cost of any continued benefits.
f.　Any appeal rights that the State chooses to make available to providers to challenge the failure of the LME to cover a service.

**B.　Recordkeeping and Reporting:** The LME must maintain records of grievances and appeals as follows:

1.　The LME shall maintain records that include a copy of the original grievance or appeal, the response, and the resolution; and

2.　The LME must provide for the retention of the records described above for five (5) years following a final decision or the close of the grievance or appeal. If any litigation, claims negotiation, audit, or other action involving the records has been started before the expiration of the five (5) year period, the records shall be retained until completion of the action and resolution of issues which arise from it or until the end of the regular five-year period, whichever is later.

**C.　Timeframe for Resolution of Grievances and Format of Disposition Notice**

1.　The LME shall resolve grievances and provide notice to all affected parties within 90 days of the date the LME received the grievance. The LME may extend the timeframe by up to 14 days if:

a.　The Enrollee requests the extension; or
b.　The LME demonstrates to DMA that there is need for additional information and the delay is in the best interest of the Enrollee.

Pursuant to 42 CFR 438.408(d), the State establishes the method by which the LME notifies enrollees of the disposition of a grievance. The LME shall notify enrollees of their findings in writing if the grievance is about quality of care. If the grievance does not involve quality of care, the LME may provide notification verbally by telephone or face-to-face. The LME may also provide notification verbally if the person filing the grievance requests that the notification not be put in writing.

**D.　Service Authorizations and Notices of Action**

1.　Requests for service authorizations must be processed within the following timeframes and requirements:

a.　For standard authorization decisions, the LME must provide notice within fourteen (14) calendar days following receipt of a request for a service, with a possible extension of up to fourteen (14) additional calendar days if:
　　ii.　The Enrollee or provider requests extension; or
　　iii.　The LME demonstrates to DMA, upon request, that there is a need for additional information and the delay is in the best interest of the Enrollee.

b.　The LME must make an expedited service authorization decision within three (3) working days after receipt of a request, when following the standard timeframe could seriously jeopardize the Enrollee's life or health or ability to attain, maintain, or regain maximum function, with a possible extension of up to fourteen (14) additional calendar days if:
　　i.　The Enrollee requests an extension; or
　　ii.　The LME demonstrates to DMA, upon request, that there is a need for additional information and the delay is in the best interest of the Enrollee.

c.　If the LME extends the timeframe, it must give written notice of the reason for the decision to extend the timeframe and inform the Enrollee of the right to file a grievance if he or she disagrees with the extension of the timeframe; and the LME must issue and carry out its determination as expeditiously as the member's health condition requires and no later than the date the extension expires.

d.　Untimely service authorizations constitute a denial. Service authorizations are considered untimely if they are not made within the standard timeframe or expedited timeframe, whichever is applicable.

71

2.   The LME must notify the requesting Provider and Enrollee of any decision to deny a service authorization request, or to authorize a service in an amount, duration, or scope that is less than requested. The notice of adverse action to the Provider need not be in writing; however, the Enrollee notice must be in writing.

3.   The Notice of an Action must explain:

   a.   The action the LME has taken or intends to take;

   b.   The reasons for the action;

   c.   The Enrollee's right to file an appeal with the LME;

   d.   How to contact the consumer relations or member services office and how to file an appeal with the LME;

   e.   The circumstances under which an expedited resolution is available and how to request it;

   f.   For Enrollees, the right to access State fair hearing pursuant to 10 NCAC 22H; how to obtain more information about those procedures; and the circumstances under which health services must be continued;

   g.   For Providers, the right to request a Reconsideration Review of reimbursement rates, payment denials, disallowances, payment adjustments, and cost settlement disallowances and adjustments pursuant to 10 NCAC 22J;

   h.   That filing or resolving an appeal through the LME's internal grievance and appeal system is a prerequisite to requesting a State fair hearing pursuant to 10 NCAC 22H;

   i.   How to request that benefits be continued pending resolution of the grievance, appeal or State fair hearing and the circumstances under which the Enrollee may be required to pay the costs of these services;

   j.   The right of the Enrollee in State fair hearing to represent himself or use legal counsel, a relative, a friend, or other spokesman, and of the potential availability of free legal services;

   k.   That Enrollees have a right to a second opinion, at the LME's expense, as part of the LME appeal process;

   l.   How to exercise the right to a second opinion during the LME appeal process; and

   m.   The specific regulations that support the action taken on the service authorization request.

4.   The LME must make the information and notices described in this Attachment readily available orally and in writing in the recipient's primary language and in each prevalent non-English language in its service area. Written material must use easily understood language and format, be available in alternative formats, and be presented in an appropriate manner that takes into consideration those with special needs.

5.   All Enrollees and potential Enrollees must be informed that information is available in alternative formats and how to access those formats. The LME must make these services available free of charge.

## E.   Timeframes for Notice of Action

1.   The LME gives notice at least ten (10) days before the date of action when the action is a termination, suspension or reduction of previously authorized Medicaid covered services, except:

   a.   The period of advance notice is shortened to five (5) days if probable Enrollee fraud has been verified; and

   b.   The notice may be given on the date of the action for the following:

      i.    Upon the death of an Enrollee;
      ii.   A signed written Enrollee statement requesting service termination or giving information requiring termination or reduction of services (where he/she understands that this must be the result of supplying that information);
      iii.  The Enrollee's admission to an institution where he/she is ineligible for further services;

72

AUG-23-2011  16:08                                                                                    P.022

AUG-23-2011  16:08                                                                                    P.022

| | | |
|---|---|---|
| iv. | The Enrollee's address is unknown and mail directed to him/her has no forwarding address; |
| v. | The Enrollee has been accepted for Medicaid services by another local jurisdiction State, territory, or commonwealth; |
| vi. | The Enrollee's physician prescribes the change in the level of medical care; |
| vii. | An adverse determination made with regard to the preadmission screening requirements for Nursing Facility admissions on or after January 1, 1989; or, |
| viii. | The safety or health of an Enrollee in a Nursing Facility would be endangered; the Enrollee's health improves sufficiently to allow a more immediate transfer or discharge; immediate transfer or discharge is required by the Enrollee's urgent medical needs; or an Enrollee has not resided in the Nursing Facility for thirty (30) days (applies only to adverse actions for Nursing Facility transfers). |

2.    The LME may give notice on the date of the action when the action is a denial of payment.

## F.    Appeal Process

1.    The LME must define appeal as the request for reconsideration of an "action", as defined in Attachment I. Pursuant to 42 CFR 438.402(b), the Enrollee may file an LME level appeal or a provider, acting on behalf of the Enrollee and with the Enrollee's written consent, may file the appeal for the Enrollee.

2.    The Enrollee must file an appeal within twenty (20) days after the date on the notice of action.

3.    The Enrollee may file an appeal either orally or in writing and must follow an oral filing with a written, signed appeal. The LME shall:

   a.    Ensure that oral inquiries seeking to appeal an action are treated as appeals and confirm those inquiries in writing, unless the Enrollee requests expedited resolution;

   b.    Provide a reasonable opportunity to present evidence, and allegations of fact or law, in person as well as in writing;

   c.    Allow the Enrollee and the Enrollee's representative opportunity, before and during the appeals process, to examine the Enrollee's case file, including medical records, and any other documents and records;

   d.    Include, as parties to the appeal, the Enrollee, the Enrollee's representative, or the legal representative of a deceased enrollee's estate.

4.    The LME must resolve each appeal, and provide notice, as expeditiously as the Enrollee's health condition requires, within State established timeframes not to exceed forty five (45) days from the day the LME receives the appeal.

5.    The LME must provide written notice of resolution, which must include:

   a.    The results and date of the appeal resolution;

   b.    For resolutions not wholly in the Enrollee's favor:
      i.     The right to request a State fair hearing;
      ii.    How to request a State fair hearing;
      iii.   The right to continue to receive benefits pending a hearing;
      iv.    How to request the continuation of benefits; and
      v.     If the LME's action is upheld in a hearing, the Enrollee may be liable for the cost of any continued benefits.

6.    The LME must continue the Enrollee's benefits during an appeal if:

   a.    The appeal is filed timely, meaning on or before the later of the following:
      i.     Within ten (10) days of the LME mailing the notice of action; or
      ii.    The intended effective date of the LME's proposed action;

   b.    The appeal involves the termination, suspension, or reduction of a previously authorized course of treatment;

73

    c.     The services were ordered by an authorized provider;

    d.     The authorization period has not expired; and

    e.     The Enrollee requests extension of benefits.

7.    If the LME continues or reinstates the Enrollee's benefits while an appeal is pending, the benefits must be continued until one of following occurs:

    a.     The Enrollee withdraws the appeal;

    b.     The Enrollee does not request a State fair hearing within ten (10) days from when the LME mails notice of an appeal resolution against the enrollee;

    c.     A State fair hearing decision adverse to the Enrollee is made;

    d.     The authorization expires or authorization service limits are met.

8.    The LME may recover the cost of the continued benefits furnished to the Enrollee while the appeal was pending if the resolution of the appeal upholds the LME's action.

9.    The LME must authorize or provide the disputed services promptly, and as expeditiously as the Enrollee's health condition requires, if the services were not furnished while the appeal was pending and the appeal resolution, or the State fair hearing, reverses the LME's action.

10.    If the appeal resolution or State fair hearing reverses a decision to deny authorization of services, and the Enrollee received the disputed services while the appeal was pending, the LME or the State must pay for those services, in accordance with State policy and regulations.

## G.   Expedited Appeal Process

1.    The LME must establish and maintain an expedited review process for appeals for situations in which the LME determines, based on a request from the Enrollee or from a provider on behalf of the Enrollee, that taking the time for a standard resolution could seriously jeopardize the Enrollee's life or health or ability to attain, maintain, or regain maximum function.

2.    Expedited appeals are just a "special type" of appeals. The LME is required to follow all standard appeal regulations for expedited requests except where differences are specifically noted in the regulation for an expedited resolution.

3.    The Enrollee may file an expedited appeal either orally or writing. No additional Enrollee follow-up is required.

4.    The LME must inform the Enrollee of the limited time available for the Enrollee to present evidence and allegations of fact or law, in person and in writing, in the case of an expedited resolution.

5.    The LME must resolve each expedited appeal and provide notice, as expeditiously as the Enrollee's health condition requires, within State-established timeframes not to exceed three (3) working days after the LME receives the appeal.

6.    For any extension not requested by the Enrollee, the LME must give the Enrollee written notice of the reason for the delay.

7.    In addition to written notice, the LME must also make reasonable efforts to provide oral notice.

8.    The LME must ensure that punitive action is not taken against a Provider who either requests an expedited resolution or supports an Enrollee's appeal.

9.    If the LME denies a request for expedited resolution of an appeal, it must:

    a.     Transfer the appeal to the standard timeframe of no longer than forty five (45) days from the day the LME received the appeal,

b.    Make reasonable efforts to give the Enrollee prompt oral notice of the denial, and follow up within two (2) calendar days with a written notice. The notice shall comply with the requirements listed under Section D of this Attachment, "Service Authorizations and Notices of Action."

## H.   State Fair Hearing

1.    An Enrollee may request a State fair hearing. The State must permit the Enrollee to request a State fair hearing within a reasonable time period specified by the State, but not less than twenty (20) or in excess of ninety (90) days from the date on the LME's notice of action;

2.    An Enrollee must exhaust the appeal process before requesting a State fair hearing.

3.    Pursuant to 42 CFR 438.408(f)(2), the parties to the State fair hearing include the LME, as well as the enrollee and his or her representative, or the representative of a deceased enrollee's estate.

4.    The State must make its final decision within the timeframes specified in 42 CFR 431.244(f), as follows:

a.    Standard resolution: Within ninety (90) days of the date the Enrollee filed the appeal with the LME (excluding the number of days the Enrollee took to subsequently file for a State fair hearing); or

b.    Expedited resolution: No later than three (3) working days after DMA receives from the LME notification of an appeal that:
    i.    meets the criteria for an expedited resolution, but was not resolved by the LME within the timeframe for an expedited resolution; or
    ii.    was resolved within the timeframe for an expedited resolution, but the decision was wholly or partially adverse to the Enrollee.