UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No.: 5:11-cv-354

| | | |
|---|---|---|
| K.C. et al., individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | **MEMORANDUM OF LAW IN SUPPORT** |
| v. | ) ) | **OF MOTION FOR PRELIMINARY** **INJUNCTION** |
| LANIER CANSLER, in his official capacity as Secretary of the Department of Health and Human Services, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

## INTRODUCTION

The Plaintiffs are Medicaid recipients because they have chronic and disabling conditions, such as cerebral palsy, seizure disorders, and autism. Although Plaintiffs have disabilities severe enough to qualify them for institutional placement, they can thrive in stable home environments at much less expense to the Defendants if they receive adequate supports. The Defendants have heretofore approved a range of health and personal care services which have allowed Plaintiffs to live with their families. Effective July 1, 2011, however, all but one of the Plaintiffs' services were abruptly and significantly reduced even though there had been no change in their underlying conditions or health care needs. The remaining Plaintiff, Alison Johns, is threatened with the imminent loss of all of her services. The Plaintiffs filed this lawsuit to challenge the failure of Defendant Cansler and his contractor and agent, Piedmont Behavioral Health (PBH), to provide them with the "due process" required by the United States Constitution and the Medicaid Act—adequate written notice and the opportunity for an impartial hearing prior to services being reduced or terminated. Plaintiffs—who rely on Medicaid coverage for these services—have yet to receive adequate individualized notices of the extent and basis of the cutbacks so that they can challenge and, hopefully, reverse incorrect service reductions and

maintain their ability to live outside of an institutional setting.

Plaintiffs are highly likely to prevail on their legal claims. Defendant PBH employees used an assessment tool to decide each Plaintiff's and others' medical and behavioral health needs but provided no opportunity to appeal the validity of their assessment scores. Then, in March 2011, based on these assessment scores, Defendant PBH assigned Plaintiffs and proposed class members maximum budget limits that require significant reductions in the core services they receive. Again, Defendant PBH did not provide the requisite notice or the opportunity for an impartial hearing to challenge the assigned budget limits to which each Plaintiff was assigned. Instead, Defendant PBH informed Plaintiffs that they must sign new plans of care substantially reducing their covered services, and if they refused to do so, *all of their services would stop*. Defendant Cansler's state Medicaid agency actively participated or acquiesced in these actions by his agent and contractor, PBH.

The complex and coercive processes used by the Defendants to establish individual need for services and the resulting budget limits were not adequately explained to Plaintiffs, leaving them unable to understand why their services have been reduced or terminated. These practices are ongoing. Defendant PBH is forcing reductions in services without first providing the legally required prior, written, individualized notice explaining the proposed action, or the opportunity for a fair hearing to contest the reductions or terminations of services, or the opportunity to continue receiving services at the previously authorized level pending the outcome of a fair hearing. Each of these systemic failures violates Plaintiffs' and class members' rights under the Medicaid Act and under the Due Process Clause of the Fourteenth Amendment.

As a result of the Defendants' actions, Plaintiffs and members of the proposed class are suffering, or are threatened with, irreparable harm to their health, safety, development, and

ability to live at home. Plaintiffs ask the Court to preliminarily enjoin Defendants from reducing or terminating Medicaid services for all named plaintiffs and proposed class members without first providing them the process that is due under the Due Process Clause and the Medicaid Act.

## LEGAL STANDARD

In actions brought under Section 1983 to enforce the Medicaid Act, district courts are invested with broad equitable powers to fashion appropriate remedial relief. *Doe v. Kidd*, 419 Fe. Appx. 411 (4th Cir. 2011). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits and to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council Inc.*, 129 U.S. 365, 374 (2008)); *Real Truth About Obama, Inc. v. Fed. Elec. Comm.,* 575 F.3d 342 (4th Cir. 2009). Plaintiffs meet this test.[1]  Plaintiffs filed their lawsuit on the day the contested reductions took effect. Thus, the preliminary relief  requested is to preserve the status quo, which "has been consistently defined as the last uncontroverted status preceding the pending litigation." *Fed. Leasing, Inc. v. Underwriters at Lloyd's,* 487 F. Supp. 1248, 1259 (D. Md. 1980), *aff'd* 650 F.2d 495.

## BACKGROUND

Title XIX of the Social Security Act establishes the Medicaid program.  *See* 42 U.S.C. §§ 1396–1396w-5. State participation is voluntary. Participating states are reimbursed by the federal government for a majority of the costs of Medicaid benefits.  *See* 42 U.S.C. § 1396b. If a state

---

[1]Although plaintiffs are simultaneously filing a motion for class certification, "[d]istrict courts are empowered to grant preliminary injunctions regardless of whether the class has been certified." *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1151, 1178 n.14 (N.D. Cal. Sept. 10, 2009) (quotation marks omitted) (on appeal).   *See also* 2 Newberg on Class Actions, § 9:45, at 411 n.3 & 413-14 (4th ed. 2002) (interim injunctive relief should be awarded on class-wide basis where "activities … are directed generally against a class of persons"; collecting cases ordering class-wide preliminary injunctive relief pending class certification).

elects to participate in Medicaid, it must "comply with detailed federally mandated standards." *Antrican v. Odom*, 290 F.3d 178, 183 n.2 (4th Cir. 2002). The Medicaid Act requires participating states and managed care entities to provide each Medicaid recipient with adequate written notice and an opportunity for an impartial hearing before services are denied, reduced or terminated. 42 U.S.C. §§ 1396a(a)(3) and 1396u-2(b); 42 C.F.R. parts 410.200 and 438.

North Carolina has elected to participate in Medicaid. *See* N.C.G.S. §§ 108A-54, 108A-56. As required by federal law, 42 U.S.C. § 1396a(a)(5), North Carolina has designated the North Carolina Department of Health and Human Services ("DHHS" or "Department") to be the "single state agency." N.C.G.S. § 108A-71. The single state agency is required, as a condition of participation in the Medicaid program, to ensure that Medicaid rules are followed. *Id.* These duties – which include assurance of the procedural protections at issue here – are non-delegable. *See, e.g.*, 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10 (single state agency may not delegate to others its authority to "issue policies, rules, and regulations on program matters"). Defendant Lanier Cansler is the Secretary of DHHS.  In *DTM v. Cansler*, 382 Fed. App'x 334, 338 (4th Cir. 2010), the Fourth Circuit held that Defendant Cansler is responsible for assuring that the actions of N.C. Medicaid services contractors comply with federal law.

## ARGUMENT

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR DUE PROCESS CLAIMS.

### A. Plaintiffs' Services Have Been Reduced or Terminated by Defendants Without First Providing Adequate Written Notice or the Right to a Hearing.

The N.C. Innovations Waiver is a Home and Community Based Waiver, approved under 42 U.S.C. § 1396n of the Medicaid Act, that offers Medicaid services to individuals with developmental disabilities who would otherwise qualify for services in an Intermediate Care Facility for the Mentally Retarded (ICF-MR). *See* Piedmont Innovations Waiver (excerpts) and

4

Apr. 1, 2008 CMS Approval Ltr., Affidavit of Douglas Sea (Sea Aff.) Exhs. A, B. The program is called a waiver because the federal Medicaid agency has given North Carolina permission to ignore certain, otherwise mandatory provisions of the Medicaid Act. All members of the Plaintiff class are consumers of services under the N.C. Innovations waiver, which currently has approximately 675 total participants. Tomlinson Apr. 18, 2011 Memo, Sea Aff. Exh. C.

Defendant Cansler's single state Medicaid agency "directly oversees the Innovations Waiver [and must] approve all policies and procedures governing waiver operations…." Sea Aff. Exh. B Att. 1: 3. Due process requirements of 42 U.S.C. § 1396a(a)(3) are not waived. Rather, the federal approval affirmatively specifies that Defendant Cansler must provide the opportunity for a fair hearing pursuant to federal regulations, 42 CFR § 431.200 Subpart E, to every waiver participant "whose services are denied, suspended, reduced, or terminated." Sea Aff. Exh. B App. F-1. Defendant Cansler contracts with Defendant PBH to perform certain functions in operating the Waiver. Sea Aff. Exh. B Att. 1: 3, App. A. PBH is a Local Management Entity ("LME"), which is described by statute as "a local political subdivision of the state." N.C.G.S. §122C-116(a). Currently PBH is the LME for Davidson, Rowan, Cabarrus, Union and Stanley counties. Sea Aff. Exh. B Att. 1: 3. PBH operates as a managed care organization under the Medicaid regulations. *Id.* Defendant Pamela Shipman is the director of PBH. Sea Aff. Exh. S.

Defendant Cansler's contract with PBH states that PBH "shall provide to Enrollees covered under this Contract, through arrangement with others, all of the Covered Services identified in Attachment H. These services shall be provided in the manner set forth in this Contract." Contract between NCDHHS, Division of Medical Assistance and PBH effective May 1, 2011 (excerpts), Sea Aff. Exh. C p. 15. Attachment H to the contract lists services including "HCBS waiver services as defined in the 'Innovations' waiver." Sea Aff. Exh. C p. 63. PBH is

responsible for approving or denying services requested under the waiver through a process known as utilization management. Sea Aff. Exh. C pp. 28-29, 61. If PBH denies, terminates, or reduces a Medicaid beneficiary's services, it must provide the individual with proper written notice of his/her right to appeal its decision. 42 C.F.R. §§438.404(b); Sea Aff. Exh. C pp. 70-75.[2]

Under the Innovations waiver, participants meet with a PBH employee, called a care coordinator, once every twelve months to develop a service plan of care, which specifies the services that are requested to be authorized for the next twelve-month period. Sea Aff. Exh. B Att. 1: 7, Exh. P p. 12; *see e.g.* Decl. of Penny C., Exh. F. The plan is then submitted to PBH employees in the Utilization Management section for approval or denial. Sea Aff. Exh. C p. 28.

Once approved, the participant's twelve-month plan of care takes effect on the first day of the participant's month of birth. Sea Aff. Exh. B App. D-2: 2-5; Sea Aff. Exh. P pp. 53, 65. Services under the waiver are "authorized" by PBH for one year when the annual plan of care is approved, although a mid-year modification of the plan can be requested by the participant if the participant's needs change. Sea Aff. Exh. B App. D-2: 5; Sea Aff. Exh. P pp. 46, 48; Penny C. Decl.¶18 and Exh. K; Patricia Holzlohner Decl.¶8; Paul Peters Decl. ¶5. The Waiver, PBH contract, and federal regulations all make clear that PBH may not reduce or terminate services during the approved one-year authorization period unless the recipient is first provided advance, adequate written notice of the proposed change. Sea Aff. Exh. B App. F-1, F-2, Exh. C. pp. 70-75, Exh. P p. 46; 42 CFR 438.210(c), 404, 420. In that instance, the recipient must be permitted to continue receiving services through the state fair hearing process. *Id.*

---

[2] The contract between DMA and PBH requires enrollees to complete PBH's internal review process, called a "Reconsideration Review" by PBH, before they may continue their appeal in the State fair hearing system. Sea Aff. Exhs. C pp. 70-75, M, O, R. *See* 42 C.F.R. §§ 438.402(a).

At the heart of this lawsuit is the process by which Defendants are imposing substantial reductions and terminations of previously approved services for Plaintiffs and class members. During 2010 and early 2011, PBH employees conducted evaluations using a "Support Intensity Scale" (SIS). Penny C. Decl. ¶20; Holzlohner Decl. ¶11; Heath Decl. ¶9; Ron S. Decl. ¶23; Johns Decl. ¶10; Melissa W. Decl. Exh. C; Sea Aff. Exh. K.[3] In some cases, PBH did not consult with the Plaintiffs' treating providers as part of the evaluation process. Peters Decl. ¶11; Holzlohner Decl. ¶9. After these SIS assessments were performed, a summary of the assessment and the resulting numerical scores was mailed to each waiver participant. However, the summary mailed to participants did not include or attach an explanation of the scoring system or adequately explain how the scoring system worked or how the individual's score was determined. The summary also did not explain whether or how the SIS score would affect the services the individual would receive in the future. Thus, even if a participant learned that she could contest the assessment score, she had no way of knowing why contesting the score was important. *See* Penny C. Decl. Exh. B; Holzlohner Decl. Exh. A; Heath Decl. Exh. A; Johns Decl. Exh. A.

PBH procedure permitted an individual to ask for the SIS assessment to be amended within 90 days of the assessment. Sea Aff. Exh. H. However, the summary mailed by PBH to participants contained no information about how to contest the accuracy of the assessment or of any deadline for doing so. Penny C. Decl. Exh. B; Holzlohner Decl. Exh. A;  Heath Decl. Exh. A; Johns Decl. Exh. A; Ron S. Decl. Exh. A; Melissa W. Decl. Exh. C.  The summary also did not inform the Medicaid recipient that failure to meet PBH's 90-day deadline for requesting an amendment of the assessment score would bar the individual from appealing reductions or

---

[3] PBH's use of the SIS instrument to measure need in children is the apparently first such experiment in the United States, which PBH describes as a "test" in the "research phase" of a tool that has "not yet been normed or finalized." Sea Aff. Exh. T; Penny C. Decl. Exh. M.

terminations in services based on that score in the future. *Id*. Participants who did try to contest the SIS score were not provided with a fair hearing by PBH that meets due process standards. Sea Aff. Exh. H.

In March 2011, PBH issued undated form letters to each Plaintiff and proposed class member informing them that PBH had assigned each of them to one of twenty-eight possible categories of need, using a Supports Needs Matrix system. Sea Aff. Exh. G. That assignment was based primarily on the scores the individual has received during the most recent SIS evaluation. Sea Aff. Exh. E App. C-4: 1. The letter stated that the categorization would result in a new maximum dollar limit for each individual's core services – those services that provide regular support and supervision to a participant, including Community Networking, Day Supports, Home Supports, Residential Supports, Respite, and Supported Employment. In most but not all cases,[4] the undated PBH letter stated that the new budget limit for the participant's assigned category of need would be implemented beginning July 1, 2011. The letter told each participant to contact his or her PBH care coordinator to revise the already-approved plan of care, in most cases before July 1, 2011, to reduce or eliminate enough core services to come within the budget limit PBH had assigned. The letter contained no information about the right to appeal this PBH decision. Penny C. Decl. Exh. G; Heath Decl. Exh. G; Ron S. Exh. F; Holzlohner Decl. Exh. B; Melissa W. Decl. Exh. A. PBH care coordinators have repeatedly informed participants and their

---

[4] For some class members PBH did not implement the SNM budget effective July 1, 2011. For example, class member Kimberly Beare's budget will not be reduced until January 1, 2012. Holzlohner Decl. Exh. B. In her case this appears to be based on the fact that January is her birthday month. Peters Decl. ¶15. PBH has never explained on what basis it decided to apply the new SNM budget limits for some waiver participants during their plan year but not for others. Peters Decl. ¶16. In implementing the reductions before their birth month for many participants, PBH appears to have violated one of its own written policies, thus arbitrarily penalizing some recipients before others. Sea Aff. Exh. Q.

care providers that their SIS scores and resulting assigned matrix categories and budget limit could not be challenged or appealed. Penny C. Decl. ¶31; Peters Decl. ¶14; Holzlohner Decl. ¶17; Heath Decl. ¶¶20, 24; Johns Decl. ¶¶20, 24; Ron S. Decl. ¶¶16, 17, 31; Melissa W. Decl. ¶¶17-18.

According to PBH, there are approximately 675 waiver participants and PBH has implemented its new budget limits for all of them. Sea Aff. Exh. D. PBH admits that about 25% of these persons (approximately 169 persons) are having their services reduced under these policies. Sea Aff. Exh. L, p. 2. All of the letters sent to Plaintiffs and other class members with SIS results as well as the letters with their assigned budget limits appear to be identical in format and none of them contain appeal rights. *See*, Penny C. Decl. Exhs. B, G, I; Heath Decl. Exhs. F, G; Johns Decl. Exh. D; Ron S. Decl. Exhs. E, F; Holzlohner Decl. Exhs. A, B; Melissa W. Decl. Exhs A, C.

Defendant PBH did enclose a booklet of general information with each undated notice it mailed in March 2011. On pages 11 to 13 of that booklet, PBH described a process by which a waiver participant could request an "intensive review." Sea Aff. Exh. F. However, as the booklet and other PBH documents make clear, this process fell short of due process standards in at least five different ways. First, recipients could only request an internal paper review by a PBH committee, not an in-person hearing by an impartial decision-maker. Penny C. Decl. ¶38, Exh. N; Sea Aff. Exh. F p. 13. Second, access to this paper review was limited to a small number of "outliers" with "unique behavioral, safety, health and/or welfare support needs that are distinguished from the support needs of other participants in the same" category. Sea Aff. Exh. E

App. C-4: 4, Exh. F pp. 10-12, Exh. N; Penny C. Decl. ¶35.[5] Third, the only way to initiate this Intensive Review process was with the agreement and support of the care coordinator, a PBH employee. Sea Aff. Exh. D. p. 11-13, Exh. C-4: 4, Exh. F p. 11-12. PBH care coordinators repeatedly have either failed to inform participants and their providers of this option or actively discouraged them from requesting such a review. Penny C. Decl. ¶35; Peters Decl. ¶14; Holzlohner Decl. ¶17; Johns Decl. ¶¶20, 26, 28, 37; Heath Decl. ¶20, 35; Ron S. Decl. ¶17, 31; Melissa W. Decl. ¶18. Fourth, the intensive review process did not allow individuals to explain how the combination of their various needs require additional services. Ron S. Decl. ¶26. [6] Fifth, the notice of decision issued by the PBH Intensive Review Committee provides no right to appeal to an impartial hearing officer. Penny C. Decl. Exh. O. This process thus was in no way a substitute for a fair hearing by which *any* participant could challenge their forced service reductions, their SIS scores, or the SNM category into which they were assigned by PBH.

Finally, if a person requested and was denied an intensive review, the PBH booklet enclosed with the undated March 2011 notice states that the "planning team may submit" a plan of care that exceeds the budget limit to PBH, and that if that plan is denied by PBH the recipient "will receive their appeal rights." Sea Aff. Exh. F p. 13. As will become clear in Section I.B. *infra*, this general, contingent, and vague information about appeal rights buried in the booklet

---

[5] PBH has stated that it will not allow more than 7% of all participants to be categorized as "outliers" and receive increased funding through the Intensive Review process. Sea Aff. Exh. F p. 11, Exh. J, Exh. N.

[6] According to the documents that waiver participants must complete in order to request an Intensive Review, waiver participants may only request an intensive review of their Medical, Behavioral *or* School needs. Penny C. Decl, Exh. N. Waiver participants thus may not ask for a review of any combination of these needs through the Intensive Review process.

does not satisfy the duty to provide understandable, *individualized* notice that clearly explains the right to appeal, how to appeal, and the deadline for doing so.

The multi-step process leading to appeal rights described in the booklet also fails to satisfy due process for at least three other reasons. First, the booklet makes clear that the only persons who can hope to receive appeal rights are those few who can convince the PBH care coordinator that they have "unique" needs such that the PBH employee will agree to request "outlier status" through an intensive review and who are then denied additional services by the intensive review. *Id*. Second, even after intensive review is denied, the discretion given to the "planning team" means that the decision whether to submit a request to exceed the budget limit is within the control of the PBH care coordinator, who is the only person on the "team" who can write the plan of care. *Id*; Peters Decl. ¶7; Penny C. Decl. ¶¶17, 40; Holzlohner Decl. ¶19. If the care coordinator and her supervisor do not deem the services "necessary," the services are not included in the plan. Sea Aff. Exhs. N, P p. 67. Third, as discussed below, the notice provided by PBH after such a plan is submitted and denied still does not satisfy due process.

Remarkably, given the labyrinth created by PBH that an individual must somehow navigate before finally receiving a notice with appeal rights, one of the Plaintiffs did manage to convince his PBH care coordinator, after being denied an intensive review, to submit a plan of care that exceeded his budget limit. Penny C. Decl. ¶40, Exh. P. PBH then did issue a written decision denying that plan, which included appeal rights. Penny C. Decl. Exh. Q. However even at this belated stage, the PBH notice fails to satisfy due process: (1) The notice is mislabeled as a denial of an initial request for services, even though the decision by PBH was to reduce or terminate existing services that had been previously approved and even though the reduction or termination was to take effect prior to the expiration of the participant's previously approved

plan of care. *See* Penny C. Decl. Exh. K. (2) The notice fails to provide the right to continuation

of the previously approved services pending the outcome of an appeal, as required by federal

regulations and due process. Penny C. Decl. Exh. Q. (3) The notice fails to adequately explain

the reason for the PBH decision to reduce or terminate services, not even mentioning the Support

Needs Matrix or budget limit but merely stating, without explanation, that the services were not

medically necessary. *Id*. (4) The notice fails to explain that the participant has the right at this

point to contest the SIS score or the Supports Needs Matrix categorization. *Id*. (5) When D.C.'s

mother tried to appeal this notice she was told she could not appeal because she had signed a

plan of care agreeing for D.C.'s services to be substantially reduced, even though she signed this

plan only under the threat by the PBH care coordinator that *all* of D.C.'s services would

otherwise end on the next day. Penny C. Decl. ¶¶43, 46, Exhs. U, V, X.

     Two other Plaintiffs never received notices with appeal rights before their services were

reduced. Plaintiff K.C.'s core services were reduced by almost 7 percent effective July 1, 2011

and will be reduced by another 18 percent effective January 1, 2012, without being notified of

any right to appeal. Heath Decl. ¶¶10, 15, 27. When his mother tried to appeal anyway, PBH

would not allow it. *Id*. at ¶¶ 19, 20. Plaintiff L.S.'s budget for core services was reduced by over

35 percent. Ron S. Decl. ¶¶9, 11, 32. His parents were required to sign the signature page for a

new plan of care reducing his services before the plan was even complete. *Id*. at ¶20.

     In contrast to the other named Plaintiffs, Plaintiff Allison Taylor Johns did *not* lose any

services effective July 1, 2011.[7] PBH refused to accept the new plan of care to reduce her

services because it was signed by her under protest. Johns Decl. ¶¶34, 38. Thus, Taylor continues

to receive services at the same level as prior to July 1. Johns Decl. ¶39. However, PBH has

---

[7] Paragraphs 89 and 90 of the Complaint incorrectly imply that Taylor' services were reduced on
July 1, 2011. Plaintiffs request that the Complaint be treated as amended to correct this error.

repeatedly informed Taylor's grandmother since July 1, 2011 that Taylor is "on the matrix system." Ms. Johns therefore believes that the budget limit assigned to Taylor effective July 1, 2011 by the undated March 2011 PBH notice nonetheless applies to her. If PBH enforces the July through December 2011 budget limit in the undated March notice in Taylor's case, because she continues to receive services at the level previously authorized in her approved plan of care, Taylor will in early October 2011 "exhaust the funds" in her budget, leaving no money to pay for *any* services for the remainder of the calendar year. Johns Decl ¶43. Moreover, Taylor's PBH care coordinator has informed her grandmother that unless she signs a new plan of care substantially reducing her services by September 8, 2011, all of Taylor's services will stop by October 31, 2011. Id. at ¶43. Thus, unless this Court promptly intervenes, Taylor's services are likely to be completely terminated in October 2011 without any prior written notice, right to appeal, or right to continue receiving those services pending the outcome of such an appeal.

In addition to creating the above obstacles to prevent Plaintiffs and other recipients from challenging PBH's decisions to reduce their services, PBH has engaged in other practices designed to coerce agreement with its decisions. The effect of these ongoing practices is to reduce and terminate Medicaid services with no written notice or right to a hearing, through verbal misinformation and intimidation. These practices by PBH employees include: (1) routinely informing participants and providers that their Supports Needs Matrix category cannot be appealed (Penny C. Decl. ¶31; Peters Decl. ¶14; Holzlohner Decl. ¶17; Heath Decl. ¶20; Ron S. Decl. ¶17; Melissa W. Decl. ¶¶17-18); (2) pressuring participants or their guardians into signing a new plan of care that does not meet the needs of the recipient, even though the previously approved plan should still be in effect (Penny C. Decl. ¶¶40, 43; Johns Decl. ¶¶24, 26, 38, 43; Peters Decl. ¶7; Holzlohner Decl. ¶19; Ron S. Decl. ¶¶20, 21; Heath Decl. ¶30); (3)

informing participants that if a new plan reducing services was not signed, *all* waiver services would end (Penny C. Decl.¶¶40, 43; Johns Decl. ¶¶26, 38, 43); (4) informing participants that the SIS score could not be contested unless it was challenged within 90 days of the SIS report, even though the SIS report contained no notice of appeal rights (Penny C. Decl. ¶31); (5) informing participants that they could not request an intensive review unless they waited six months, or otherwise discouraging them from making that request (Penny C. Decl. ¶35; Peters Decl. ¶14; Holzlohner Decl. ¶17; Johns Decl. ¶¶20, 26, 28, 37; Heath Decl. ¶20, 35; Ron S. Decl. ¶17, 31; Melissa W. Decl. ¶18); (6) suggesting to participants that if their plan was not changed to reduce services they would run out of money and their services would stop entirely. (Johns Decl.¶39). In sum, PBH has created an environment where participants are intimidated into accepting PBH decisions, making a sham of their due process rights.

### B. PBH Notices and Other Practices Violate Due Process and the Medicaid Act.

It is well-established that Medicaid recipients have a statutory entitlement to benefits that is protected by the Due Process Clause of the Fourteenth Amendment. *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 787 (1980) (Medicaid recipient has right protected by due process to continued Medicaid benefits to pay for services from the qualified provider of his choice). In *Goldberg v. Kelly*, 397 U.S. 254 (1970), the Court noted that termination of welfare benefits for the poor (a category which includes the Medicaid program) "pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits." *Id.* at 264. Thus, the Court held that such individuals are entitled, under due process, to an evidentiary hearing before benefits can be discontinued. Such recipients must also be given an "opportunity to be heard … at a meaningful time and in a meaningful manner." 397 U.S at 267. These principles

> require that a recipient have timely and adequate notice detailing the reasons for a proposed termination … . The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard … . Welfare recipients must … be given an opportunity to confront and cross-examine the witnesses relied on by the department … [and] … the recipient must be allowed to retain an attorney if he so desires … . And, of course, an impartial decision maker is essential.

397 U.S. at 268-71. *See also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (requiring "notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

The written notice required by due process must provide recipients with individualized information they can use to decide whether the agency has made mistakes in terminating their benefits and, if so, how they can contest those mistakes at a hearing. *Goldberg*, 397 U.S. at 266, 268; *see also Gray Panthers v. Schweiker*, 652 F.2d 146, 168 (D.C. Cir. 1981) (without adequate notice of reasons for denial "hearing serves no purpose"); *Vargas v. Trainor*, 508 F.2d 485, 490 (7th Cir. 1974) (notice especially important because of "human tendency, even among those more experienced and knowledgeable in the ways of bureaucracies than … disabled persons … to assume that an action taken by a government agency in a pecuniary transaction is correct").

A proper due process notice also informs the individual of their right to an impartial pre-termination hearing and how to exercise that right. "The purpose of the notice under the Due Process Clause is [also] to apprise the affected individual of, and permit adequate preparation for, an impending hearing." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978); *see Mallette v. Arlington Co. Employees' Supplemental Ret. Sys.*, 91 F.3d 630, 640-41 (4th Cir. 1996) (quoting *Memphis Light* and finding notice was not "reasonably calculated" to afford claimant a meaningful opportunity to present her side of the story). *See also Goldberg*, 397 U.S. at 267-68 (requiring "timely" notice "detailing the reasons for a proposed action"); *Mullane* , 339

15

U.S. at 315 ("[W]hen notice is a person's due,… [t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.").

These due process requirements have been repeatedly enforced by the courts in the context at issue here: the denial, reduction, or termination of services provided to Medicaid recipients. *See, e.g., Granato v. Bane*, 74 F.3d 406 (2d Cir. 1996); *Catanzano v. Dowling*, 60 F.3d 113 (2d Cir. 1995); *Featherston v. Stanton*, 626 F.2d 591 (7th Cir. 1980); *Jonathan C. v. Hawkins*, 2007 WL 1138432 (E.D. Tex. Apr. 16, 2007);[8] *Cramer v. Chiles*, 33 F. Supp. 2d 1342, 1352 (S.D. Fla.1999); *Ladd v. Thomas*, 962 F.Supp. 284 (D. Conn. 1997); *Perry v. Chen*, 985 F. Supp. 1197 (D. Ariz. 1996); *Mayer v. Wing*, 922 F. Supp. 902 (S.D.N.Y. 1996); *Haymons v. Williams*, 795 F. Supp. 1511 (M.D. Fla. 1992); *Greenstein v. Bane*, 833 F. Supp. 1054, 1076 (S.D. N.Y. 1993). *See also* 42 C.F.R. § 431.205(d) (stating federal Medicaid regulations are incorporating the requirements of *Goldberg*).[9]

As described in Section I.A. *supra*, none of the notices sent to Plaintiffs and other class members even arguably comply with these fundamental due process requirements. Only one of the letters sent by PBH throughout the complex process contains any information whatsoever about the right to appeal. Penny C. Decl. Exh. Q. One sentence buried on page 13 of a booklet mailed in March 2011 states that participants with "unique" needs who convince a PBH employee to first request an intensive review and then, upon denial of that request, to submit a plan contrary to the budget limit finally "will receive their appeal rights." This is the only mention of appeal rights that most waiver participants ever receive. Sea Aff. Exh. F. This

---

[8]  Pursuant to Local Civil Rule, E.D.N.C., 7.2(d), a copy of this and the other unpublished decisions cited in this brief are being furnished to the Court and opposing counsel.

[9] Because the termination or reduction of services to Plaintiffs is the result of individual factual determinations of need through the SIS assessment, the exception to notice and hearing rights for "automatic change" does not apply here. *Compare Atkins v Parker,* 472 U.S. 115 (1985) *with Soskin v. Reinertson,* 353 F.3d 1242, 1263 (10th Cir. 2004).

contingent, narrowly limited, and vague sentence is inadequate. Federal law requires that an explanation of appeal rights be contained in an individualized notice at the time an action is taken to reduce or terminate services. *See* 42 C.F.R. §§431.206 and 431.210; *Goldberg*; *Baker v. Dep't of Health & Soc. Servs.*, 191 P.3d 1005 (Alaska 2008) (holding Medicaid notices must, as feasible, show how and why reductions in at-home services were determined, including copy of the assessment tool, and that notice requirement cannot be construed to include information recipients already had); *cf.* 42 C.F.R. § 438.10(g) (requiring information about appeals to be included in general information provided to enrollees) *with* 42 C.F.R. §§ 438.402, 438.404 (specifying the content of the written notice that must be provided to the enrollee at the time an action is taken to deny, reduce or terminate services).

Of importance, there is also little or no information in any of the PBH notices providing an individualized factual or legal explanation for PBH's decisions. The SIS Summary mailed to Plaintiffs contains the individual's "raw numbers" for different areas and "the percentage of SIS subscales" but no total SIS score, no explanation of what the raw numbers or percentages mean, nothing about how to obtain a further explanation or copy of the actual SIS evaluation, nothing about PBH's legal authority for using the SIS, and nothing about the effect these scores would have on the recipient's services. *See e.g.* Penny C. Decl. Exh. B. The undated March 2011 notice informs participants what category of need they have been placed in and the resulting budget limit but says *nothing* about why this individual was placed in that category, how PBH determined the budget limit for that category, or what legal authority exists for the change being made. *See e.g.* Penny C. Decl. Exh. G. The Intensive Review Committee's decision notice contains no explanation whatsoever for their decision. *See e.g.* Penny C. Decl. Exh. O. The June, 22, 2011 notice mailed to D.C. simply states that continuation of his services is "denied" because

"no medical necessity to support services at requested level of care." Penny C. Decl. Exh. Q. There is no mention in this notice of D.C.'s SIS evaluation or of the budget limit imposed by PBH March 2011 as the reasons that his services must be reduced. *Id.*

Due process requires a notice "detailing the reasons for a proposed termination" and including "the legal and factual bases" for the decision. *Goldberg*, 397 U.S. at 267-68. *See also, e.g., Hamby v. Neel*, 368 F.3d 549 (6th Cir. 2004); *Ortiz v. Eichler*, 794 F.2d 889 (3d Cir. 1986); *Turner v. Walsh*, 574 F.2d 456 (8th Cir. 1978); *Vargas v. Trainor*, 508 F.2d 485 (7th Cir. 1974); *Baker v. Alaska DHHS*, 191 P.3d 1005 (Alaska 2008). As one district court has explained:

> At a minimum, due process requires the agency to explain, in terms comprehensible to the claimant, exactly what the agency proposes to do and why the agency is taking this action … . This detailed information is needed to enable claimants to understand what the agency has decided, so that they may assess the correctness of the agency's decision, make an informed decision as to whether to appeal, and be prepared for the issues to be addressed at the hearing.

*Ortiz v. Eichler*, 616 F. Supp. 1046, 1061, 1062 (D. Del. 1985)(citations omitted).

Similarly, the Alaska Supreme Court has explained the role of the notice as follows:

> Due process notices are designed to protect recipients from erroneous deprivation of benefits by allowing them to assess whether or not the agency's calculations are accurate … . [A]gencies make mistakes. If a major purpose served by benefit change or denial notices is protecting recipients from agency mistakes, then it stands to reason that such notices should provide sufficient information to allow recipients to detect and challenge mistakes.

*Allen v. Alaska Dep't of Health & Soc. Servs.*, 203 P.3d 1155, 1167-68, n.61 (Alaska 2009) (collecting cases). Notably, in reaching its conclusions, the *Allen* Court found no authority for the assertion that failure of the agency to comply "with an explicit federal regulation notice requirement can be cured if a recipient, through her own initiative, challenges the Agency action, and eventually obtains the information that the federal regulations specifically required the Agency's initial notice to contain." *Id.* at 1169, n.68 (collecting cases). *See also, e.g.*, *Kapps v. Wing* , 404 F.3d 105, 124 (2d Cir. 2005) ("Claimants cannot know *whether* a challenge to an

agency's action is warranted, much less formulate an effective challenge, if they are not provided with sufficient information to understand the basis for the agency's action. [citation omitted]. Thus, in the absence of effective notice, the other due process rights afforded a benefits claimant … are rendered fundamentally hollow."); *Weaver v. Dept. of Social Services*, 791 P.2d 1230 (Colo. Ct. App. 1990) (Medicaid notice reducing services was constitutionally inadequate because it did not furnish accurate information to allow recipients to ascertain the standards governing coverage). *See Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998) (due process violated where notices "created an unacceptable risk of confusion"). "Unless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose and resembles more a scene from Kafka than a constitutional process." *Gray Panthers*, 652 F.2d at 168.

The pervasive PBH practice of discouraging recipients from challenging its decisions also violates due process. Due process protects against unreasonable state agency action that has the effect of denying access to the hearing process. "A system or procedure that deprives persons of their claims in a random manner…necessarily presents an unjustifiably high risk that meritorious claims will be terminated." *Logan v. Zimmerman Brush*, 455 U.S. 422, 434-35 (1982). Practices of discouragement, misinformation and intimidation effectively deny, reduce, or terminate Medicaid services by interfering with the opportunity for a hearing. The due process right to be heard is empty if access to the hearing process is denied.

Finally, Defendants have violated due process by reducing or terminating services for Plaintiffs in the middle of previously approved twelve-month authorization periods, and yet treating that decision as a denial of an initial request for services, so that recipients are denied their right to continued services pending appeal. PBH has informed Plaintiffs that if they do not agree to this reduction in services, services will stop altogether. The essence of *Goldberg* and its

progeny is the well-settled proposition that notice and the opportunity for an impartial hearing must be provided *before* Medicaid services are terminated or reduced.[10]

## II. PLAINTIFFS AND CLASS MEMBERS ARE EXPERIENCING AND ARE THREATENED WITH IRREPARABLE HARM.

Numerous courts have found irreparable harm where Medicaid beneficiaries' due process rights have likely been violated and the beneficiaries face loss of Medicaid services. In *Benjamin H. v. Ohl*, 1999 WL 34783552 (S.D. W.Va. July 15, 1999), for example, the court granted a preliminary injunction, finding the plaintiffs were likely to succeed on their Medicaid due process and other claims. The court found irreparable harm because the plaintiffs were being denied home and community based services they needed, including therapy, habilitation services, and respite care; plaintiffs were losing skills previously acquired, where existing services were insufficient to maintain them; and families and care givers were experiencing unnecessary stress due to the lack of appropriate services. *Id.* at *12. *See also Knowles v. Horn,* 2010 WL 517591 (N.D. Tex. Feb. 10, 2010) (finding irreparable harm where in-home Medicaid services terminated without due process); *Cota v. Maxwell-Jolly*, 688 F. Supp.2d 980 (N.D. Cal. 2010) (finding plaintiffs likely to succeed on due process claims and that "the reduction or elimination of public medical benefits is sufficient to establish irreparable harm to those likely to be affected by the program cuts."); *Crawley v. Ahmed*, 2009 WL 1384147 at *28 (E.D. Mich. May 14, 2009)

---

[10]*Goldberg*'s requirements apply equally to Plaintiffs and class members whose terminations or reductions of services occur at the end of their twelve-month authorization periods. The state Medicaid agency, through its contractor, has the right to conduct periodic utilization reviews in order to assure that recipients continue to meet the requirements to receive Medicaid payment for their services. *See* 42 C.F.R. §§ 435.916(a), 440.230(d). However, these utilization review procedures in no way convert Medicaid into a time-limited benefit not protected by due process. To the contrary, the federal Medicaid Act requires the state agency to furnish Medicaid to all eligible individuals, 42 U.S.C. § 1396a(a)(8), and the implementing regulation specifies that the state agency must "continue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." 42 C.F.R. §435.930(b). The Medicaid regulations, which specifically implement *Goldberg*'s constitutional protections, require Defendant Cansler to continue benefits pending appeal. 42 C.F.R. 431.231(c). *See Jonathan C. v. Hawkins, supra.*

(finding plaintiffs likely to succeed on their Medicaid due process claims and that irreparable harm existed because "it is undeniable that the unpaid bills, loss of needed medical assistance, and ultimately poor health suffered by Plaintiffs, cannot be adequately addressed by the promise of future Medicaid coverage"); *Newton Nations v. Rogers*, 316 F. Supp. 2d 883, 888 (D. Ariz. 2004) (finding Medicaid beneficiaries likely to succeed on their due process and other claims and that irreparable harm existed where recipients could be denied medical care if they were unable to pay increased costs of copayments for medical services); *Bizjak v. Blum*, 490 F. Supp. 1297, 1303 (N.D.N.Y. 1980) (finding irreparable harm in due process case, stating "It is not at all inconceivable that the inability to review the case record prior to a 'fair hearing' could result in the further inability to prepare properly for the hearing with the result being an erroneous denial of benefits. Thus it is clear that the possibility of irreparable injury in this case is neither remote nor speculative but, in fact, highly likely."); s*ee also Catanzano* v. *Dowling*, 60 F.3d 113 (2d Cir. 1995) (affirming preliminary injunction in Medicaid due process case).

Indeed, courts have long-recognized irreparable harm where reductions or terminations of Medicaid services will create the potential or actual loss of health care. *See Beltran v. Meyers,* 677 F.2d 1317, 1322 (9th Cir. 1982) (holding irreparable injury is established when enforcement of a Medicaid policy "may deny needed medical care"); *Massachusetts Ass'n of Older Americans v. Sharp*, 700 F.2d 749, 753 (1st Cir. 1983) ("Termination of [Medicaid] benefits that causes individuals to forego such necessary medical care is clearly irreparable injury."); *Caldwell v. Blum*, 621 F.2d 491, 498 (2nd Cir. 1980) (finding harm where Medicaid applicants would "absent relief, be exposed to the hardship of being denied essential medical benefits").

In *Peter B. v. Sanford*, 2010 WL 5912259 (D. S.C. Nov. 24, 2010), the South Carolina Medicaid agency reduced medical and personal care services to plaintiffs who had "behavioral

and special needs that benefitted from a stable environment and personalized treatment." *Id.* at *9. The plaintiffs moved to enjoin the reductions, providing evidence of their declining mental and physical conditions and lost opportunities of community living. While acknowledging that the plaintiffs' at home care is "complicated, burdensome, and inexact," the court decided that "if anyone knows what might be the best, among many less than perfect alternatives, it is the plaintiffs, their families, and their physicians." *Id.* at 4. The court concluded that a preliminary injunction should lie. *See also Comancho v. Tex. Workforce Comm'n*, 326 F.Supp. 2d 794, 802 (W.D. Tex. 2004) (loss of Medicaid benefits constitutes irreparable harm); M*ayer v. Wing*, 922 F.Supp. 902, 905, 909 (S.D.N.Y. 1996) (holding "reduc[tion] or terminati[on of] home care services … would result in the deprivation of life-sustaining medical services. This certainly constitutes irreparable harm."); *McMillan v. McCrimon*, 807 F. Supp. 475, 479 (C.D. Ill. 1992) ("The nature of [the] claim—a claim against the state for medical services—makes it impossible to say that any remedy at law could compensate them.").

Courts have also found actions that force plaintiffs to pay out-of-pocket for care and/or forego other necessary expenditures are noncompensable, irreparable injuries. In *Schalk v. Teledyne* 751 F. Supp. 1261 (W.D. Mich. 1990), retirees sought to enjoin changes in a collective bargaining agreement that resulted in increased out-of-pocket payments for health insurance ranging from $592 to $1900 annually. The court found these payments would impose a "financial hardship" and place an unacceptable "financial planning burden" on plaintiffs. *Id.* at 1268. The "uncertainty and worry" posed by the "lack of knowing just how much money will be needed to cover medical expenses" under the new plan was also a form of noncompensable injury causing irreparable harm. *Id.* In a similar case, *Merkner v. AK Steel Corp.*, 2010 WL 373998 (S.D. Ohio Jan. 29, 2010), the collective bargaining agreement was changed to eliminate

no-cost health insurance. The court issued an injunction, finding that increases in out-of-pocket expenses for medical coverage would result in "decreases in medical care, the rationing of other necessities of life, and an increased uncertainty and anxiety…." *Id.* at *5. "The uncertainty and worry of not knowing the full extent of their prospective health expenses under the newly reduced plan would cause a worry and uncertainty that could not be compensated." *Id.*

Not surprisingly, courts also have found increases in out-of-pocket payments to result in irreparable harm to Medicaid beneficiaries. In *Mowbray v. Kozlowski¸* 725 F.Supp. 888 (W.D. Va. 1989), the court enjoined a Medicaid policy that resulted in some beneficiaries being terminated from the program while others were required to pay more out-of-pocket before becoming eligible. The Virginia Medicaid agency asked the court to stay the injunction, but the court refused. The court found beneficiaries were threatened with irreparable harm because

> some number of these will be faced with the difficult decision of either forgoing needed medical attention, forgoing other expenditures, or disposing of enough of their property to come within the guidelines as to assistance … . If class members choose to seek medical care and skimp on other necessities such as food, clothing, or shelter they may also be substantially harmed.

*Id.* at 891. *See also Reed v. Lukhard*, 578 F. Supp. 40, 42 (W.D. Va. 1983) (finding irreparable harm where plaintiffs had other sources of income, noting that while plaintiffs "have not yet starved to death," the public benefits "no doubt, go far toward improving the daily quality of their lives."); *Claus v. Smith*, 519 F. Supp. 829, 831 (N.D. Ind. 1981) (noting "domino effect" of increased out of pocket payments and entering preliminary injunction in a Medicaid case); *Becker v. Toia*, 439 F. Supp. 324, 336 (S.D.N.Y. 1977) (enjoining Medicaid copayments, finding that "injury to those whose health is maintained on the slenderest chemical balance provided through medication is not merely irreparable, it is ultimate.").[11]

---

[11] In all probability, a future suit by the Plaintiffs for restitution of their out-of-pocket payments would be barred on Eleventh Amendment grounds. See *Edelman v. Jordan*, 415 U.S. 656 n.5,

A finding of irreparable harm is also appropriate where the services at issue permit plaintiffs who would otherwise be institutionalized to remain in their homes. *Crabtree v. Goetz*, 2008 U.S. Dist. LEXIS 103097 at *82 (home care service cuts will cause irreparable injury because "institutionalization will cause Plaintiffs to suffer injury to their mental and physical health, including a shortened life, and even death for some Plaintiffs"); *Long v. Benson*, 2008 U.S. Dist. LEXIS 109917 (N.D. Fla. Oct. 14, 2008); *aff'd*, 2010 U.S. App. LEXIS 12826 (11th Cir. 2010) (similar); *Martinez v. Schwarzenegger*, 2009 U.S. Dist. LEXIS 57960 at *17 (N.D. Cal. June 26, 2009) (institutionalizing individuals who can comfortably survive in their home with the help of [Medicaid] providers will "cause Plaintiffs to suffer injury to their mental and physical health, including a shortened life, and even death for some Plaintiffs."), *aff'd sub nom Dominguez v. Schwarzenegger,* 596 F.3d 1087 (9th Cir., 2010), *certiorari granted on other grounds sub nom Maxwell-Jolly v. Cal. Pharm. Ass'n,* 131 S.Ct. 192 (2011).

The Plaintiffs in this case are suffering direct, serious harm and will, in the future, suffer even greater harm if a preliminary injunction is not granted. Plaintiffs' physical and mental conditions are deteriorating, and they are losing skills previously acquired. In addition, the reductions and terminations are causing unnecessary stress on beneficiaries and their families. The lack of appropriate services is forcing some families to consider institutionalization. Finally, Plaintiffs' families are experiencing financial hardship and uncertainty attributable to increased out-of-pocket payments that they are being required to make in order to maintain health services.

Plaintiff D.C. is a 14-year-old Medicaid recipient who suffers from severe autism. He is

---

671 (1974) (allowing prospective relief but finding additional relief sought infringed on sovereign immunity under the Eleventh Amendment because the plaintiffs sought retroactive payment of benefits that were found to have been wrongfully withheld). *But cf. DTM v. Cansler*, 382 F. App'x 334, 337-38 (4th Cir. 2010) ("[T]he request for prospective reinstatement of benefits is precisely the type of relief that we recognized in *Kimble v. Solomon*, 559 F.2d 599, 605 (4th Cir. 1979), that plaintiffs may seek consistent with the Eleventh Amendment when they allege a state Medicaid agency's reduction of their benefits violated federal law.").

verbally non-communicative and uses a modified version of American Sign Language to communicate. Decl. ¶ 3-4. D.C. needs a stable environment, including someone with him at all times who is familiar with his behaviors and how he communicates his needs. D.C. requires substantial prompting, supervision, repetition, and training in order to complete the most basic activities of daily living, including personal hygiene, toileting, bathing, dental care, eating, dressing and repetition of skill training. He requires supervision at all times to ensure that he does not injure himself because of his lack of awareness of danger and lack of safety skills. *Id.* at 4-5. D.C. also requires daily therapeutic intervention to address inappropriate behaviors, including "childlike behaviors that are inappropriate for his age, taking things that don't belong to him if he is curious, inability to tolerate changes in routine and order, and inappropriate self-soothing and self-stimulatory behaviors." *Id.* at 7. Since authorization for about half of the hours of his primary training service (In-Home Skill Building, or "IHSB") was terminated without due process effective July 1, 2011, his parents have had to pay for those services out of their savings to assure his physical safety, control his behavior, and prevent him from losing essential skills he has worked so hard to obtain. *Id.* ¶¶ 4-11, 48-51. They will soon no longer be able to afford to keep his services in place, particularly since a further reduction in his services without due process is scheduled to take place on January 1, 2012. Id. ¶¶ 48, 49. When D.C.'s services were reduced in the past, his skill development came to a "standstill." *Id.* at ¶ 51. According to his mother, the reductions being forced by Defendants will place DC "at risk of further delays in his progress in learning essential life skills and attainment of his other plan goals. His health, development, and safety will be at growing risk without the previously approved amount of IHSB and Respite services. His ability to communicate his needs and wants, his physical safety, and his progress towards attainment and retention of essential skills to allow him to continue to

live at home are dependent on consistent provision of the professional services he receives." *Id.* at ¶ 50. Without necessary services, "there is little question that D.C. will eventually end up living in an institution." *Id.*

Plaintiff Allison Taylor Johns has ten different chronic medical conditions, including mental retardation, cerebral palsy, and a seizure disorder. Johns Decl. ¶4. Taylor is threatened with losing *all* of her waiver services unless the Court acts. *Id* at ¶43. If her services stop or are reduced, her grandmother, who has cared for her all of her life, expects Taylor to regress and have more behavior problems. *Id* at ¶44. As her grandparents age, Taylor's needs for support from others is increasing. *Id* at ¶45. Her current level of services, particularly skill building to increase her independence, is essential if she is to continue to be able to live at home. *Id.* Dr. Jeanne Murrone, a psychologist who recently evaluated Taylor, has opined that without the support services she receives, "Taylor will not be able to live independently." Murrone Decl. ¶8. She further states that scheduled reductions in her services "will produce a substantial likelihood of both increasing the difficulties of meeting Taylor's needs in the community and losing any skills developed from her participation in these services." *Id* at ¶10.

Plaintiff K.C. is a 14-year old Medicaid recipient who has cerebral palsy, a seizure disorder, moderate mental retardation, and incontinence. Heath Decl. ¶ 3. Since losing some of his Medicaid services without due process, K.C. is experiencing more crying episodes and violent behavior and has lost self-care skills. *Id.* at ¶¶ 32-34. An even greater reduction in K.C.'s services without due process is scheduled for January 1, 2012. *Id.* at ¶14. His treating physician believes that scheduled reductions in his services "will result" in difficulties in addressing his needs and a regression in his skills, creating a "substantial risk" of losing developmental and habilitative skills and threatening him with "irreparable harm to K.C.'s safety and development."

Decl. of Kristen Strange, M.D. ¶¶10-11.

Thirteen-year-old Plaintiff L.S. suffers from autism and a seizure disorder. Ron S. Decl. ¶ 3. He needs assistance with most activities of daily living. *Id* at ¶4. He has violent behaviors and will wander if left alone. *Id* at ¶¶ 5, 6. Since his services have been substantially reduced, his communication has regressed, he is more easily distracted from tasks, he has become more withdrawn, and his inappropriate behaviors have increased. *Id* at ¶¶33-35. His skill development has been affected, putting him at risk of institutionalization. *Id* at ¶36.

Kimberly Beare, age 42 and a member of the putative plaintiff class, has Down Syndrome and mental retardation. Holzlohner Decl. ¶4. She functions at the level of a three-year-old. *Id.* at ¶3. She is threatened with losing skills and with safety risks if her services are reduced without due process by 20 percent, as scheduled for January 1, 2012. *Id.* at ¶¶21-23. Her mother does not know how she "will possibly be able to continue" to care for her daughter without her current services. *Id.* at ¶7, 21.

F.A. is age 17 and suffers from mental retardation and a severe seizure disorder. Melissa W. Decl. ¶3. He requires 24-hour supervision and requires assistance with "most all of his daily activities. *Id.* at ¶¶3, 4. Since his core services were reduced by 55% effective July 1, 2011 without due process, his behavior has worsened and he is unable to learn the new skills in his plan or to maintain the skills he previously achieved. Melissa W. Decl. ¶¶9-11, 22.

**III. THE BALANCE OF EQUITIES FAVOR PLAINTIFFS.**

Defendants must show that proposed injunctive relief poses more than mere fiscal and administrative problems for Defendants to tip the balance away from Plaintiffs, who are suffering physical, emotional, and financial harm in the absence of relief. The Supreme Court has held that a state Medicaid agency's claim of economic harm does not outweigh the harm

posed to a plaintiff facing the threat of having to forgo necessary medical care:

> On the other side of the balance are the life and health of the members of this class: persons who are aged, blind, or disabled and unable to provide for necessary medical care because of lack of resources. The District Court noted that some of the members of the class have already died since this suit was filed, and the denial of necessary medical benefits during the months pending filing and disposition of a petition for writ of certiorari could well result in the death or serious medical injury of members of this class. The balance of equities therefore weighs in favor of the respondents.

*Blum v. Caldwell,* 446 U.S. 1311, 1316 (1980). *See also Todd v. Sorrell,* 841 F.2d 87, 88 (4th Cir. 1988) ("[H]arm to the plaintiff would have been enormous, indeed fatal, were the injunction denied, and harm to the Commonwealth if granted, while it may not have been negligible, was measured only in money and was inconsequential by comparison."); *L.J. v. Massinga*, 838 F.2d 118 (4th Cir. 1988) (monetary costs and administrative inconvenience to city from preliminary injunction was outweighed by preventing continuing harm to plaintiffs caused by defendants' mismanagement of foster care system). *Accord Daniels v. Wadley,* 926 F. Supp. 1305, 1313 (M.D. Tenn. 1996); *Kansas Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1552-53 (D. Kan. 1993); *see generally Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994).

## IV. THE PUBLIC INTEREST FAVORS ISSUANCE OF THE INJUNCTION.

An injunction is also in the public interest. The public interest is served when laws passed by Congress and the U.S. Constitution are enforced. *See Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 372 (8th Cir. 1991); *Kansas Hosp. Ass'n*, 835 F. Supp. at 1553; *see also Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 235 F. Supp. 2d 1143, 1162 (W.D. Wash. 2002); *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (where an injunction seeks to require defendants to comply with existing law, the injunction imposes no burden but "merely seeks to prevent the defendants from shirking their responsibilities"); *White v. Martin*, 2002 U.S. Dist. LEXIS 27281, 22-23 (W.D. Mo. 2002).

In determining whether the public interest will be disserved by the granting of a request for preliminary injunction, courts may look to the intent in enacting the law sought to be enforced. *Johnson v. U.S.D.A.*, 734 F.2d 774, 788 (11th Cir. 1984). Among the stated purposes of the Medicaid Act is "to furnish … services to help [low income] families and individuals attain or retain capacity for independence or self-care." 42 U.S.C. § 1396(2). Preserving Plaintiffs' health, well-being, and independence is thus squarely in the public interest.

Importantly, Plaintiffs do not seek a ruling from this Court that they are entitled to the services at issue, but only that Defendants must comply with fundamental due process requirements before reducing or terminating those services. Long term fiscal interests thus are not threatened by issuance of the injunction. Indeed, if the services at issue are determined at a fair hearing to be necessary for Plaintiffs to remain in their homes, Defendants will pay less for those services than for much more expensive institutional care, which costs an average of $135,000 per year for persons with developmental disabilities. Sea Aff. Exh. E App. C-4:6. Providing the necessary amount of services under the Innovations Waiver thus saves the State money by allowing individuals to remain in their homes longer. Because of support from their families Plaintiffs each need services costing far less than the cost of institutionalization. Penny Decl. ¶24; Johns Decl. ¶9; Ron S. Decl. ¶9; Heath Decl. ¶10; Holzlohner Decl. ¶15. However, this assistance is critical to their ability to live safely at home. *See generally* attached Decls.

## V. THIS COURT SHOULD WAIVE THE BOND.

Plaintiffs request that they not be required to post any cash bond under Federal Rule of Civil Procedure 65. This Court has discretion to issue a preliminary injunction without requiring Plaintiffs to give security. *See, e.g.*, *Baldree v. Cargill,* Inc., 758 F. Supp. 704 (M.D. Fla. 1990), *aff'd*, 925 F.2d 1474 (11th Cir. 1991). Federal courts routinely waive bond requirements in suits

to enforce important federal rights of public interest. *See, e.g., Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999); *Doctor's Assoc., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995); *Stockslager v. Carroll Elec. Co-op. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976). Courts also have used their discretion to waive the bond requirement for indigent plaintiffs. *See, e.g. Bass v. Richardson*, 338 F. Supp. 478, 490 (S.D.N.Y. 1971) ("It is clear that indigents, suing individually or as class Plaintiffs, ordinarily should not be required to post a bond under Rule 65(c)."); *Denny v. Health and Soc. Services Bd. of State of Wisconsin*, 285 F. Supp. 526, 527 (E.D. Wis. 1968) ("Poor persons… are by hypothesis unable to furnish security as contemplated in Rule 65(c), and the court should order no security in connection with this preliminary injunction.").

Important federal rights are at stake in this litigation. *See, e.g., Temple Univ. v. White*, 941 F.2d 201, 220 n. 27 (3d Cir. 1991) ("Public Policy under [federal law governing state modification of Medicaid programs] mandates that parties in fact adversely affected by improper administration of programs pursuant thereto be strongly encouraged to correct such errors."). Given the high likelihood of success on the merits, Plaintiffs' status as public assistance recipients, as well as the fact that the injunction seeks merely to require Defendants to comply with federal law in their procedures to reduce or stop services, no bond should be required.

## CONCLUSION

For all the foregoing reasons, Plaintiffs request that this Court issue a preliminary injunction prohibiting Defendants from reducing or terminating Medicaid services to Plaintiffs and others similarly situated without first complying with Due Process requirements.

Dated: August 24, 2011          ATTORNEYS FOR PLAINTIFFS

                               /s/ Douglas S. Sea_____
                               Douglas Stuart Sea

N.C. State Bar No. 9455
LEGAL SERVICES OF SOUTHERN PIEDMONT, INC.
1431 Elizabeth Avenue
Charlotte, North Carolina 28204
Telephone: (704) 376-1600
dougs@lssp.org


/s/ John R. Rittelmeyer
John R. Rittelmeyer
N.C. State Bar No. 17204
Jennifer L. Bills
N.C. State Bar No. 37467
DISABILITY RIGHTS NC
2626 Glenwood Avenue, Suite 550
Raleigh, NC 27608
Phone: (919) 856-2195
Fax: (919) 856-2244
john.rittelmeyer@disabilityrightsnc.org
jennifer.bills@disabilityrightsnc.org


/s/ Jane Perkins
Jane Perkins
N.C. State Bar No. 9993
Jina Dhillon
N.C. State Bar No. 41997
NATIONAL HEALTH LAW PROGRAM
101 E. Weaver Street, Ste. G-7
Carrboro, NC 27510
Telephone: (919) 968-6308
perkins@healthlaw.org

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a true copy of Plaintiffs' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM, AFFIDAVIT, and DECLARATIONS upon the Defendant's attorneys via electronic means through the CM/ECF system to:

Belinda Smith, N.C. Department of Justice

Stephen D. Martin and Wallace C. Hollowell, Nelson, Mullins, Riley and Scarborough

Rabotteau T. Wilder, Womble, Carlyle, Sandridge, and Rice

This the 24th day of August, 2011.


/s/ _____
Douglas Sea