IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CV-354-FL

| | | |
|---|---|---|
| K.C. et al., individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | O R D E R ▉▉▉▉▉ |
| LANIER CANSLER, in his official capacity as Secretary of the Department of Health and Human Services, et al., | ) ) ) ) | |
| Defendants. | ) | |

This matter comes before the court on Plaintiffs' Motion to Disqualify Counsel. [DE-27].

Plaintiff seeks to disqualify attorney Raboteau T. Wilder, Jr. ("Wilder") and the law firm of Womble,

Carlyle, Sandridge & Rice, PLLC ("the Firm") from representing two defendants in the present case.

Responsive briefing is complete and a hearing was held on December 29, 2011 to further develop

the record. Following the hearing, an oral order was issued allowing Plaintiffs' motion. This written

order fully encapsulates this court's order on Plaintiffs' motion.[1]

## I. FACTUAL BACKGROUND

Plaintiffs' motion is premised on the allegation that the instant matter ("*K.C.*") is related to

another pending lawsuit, *DTM v. Cansler* ("*DTM*"), 7:08-CV-57-H (E.D.N.C.). The named

plaintiffs in both cases – minor children – are Medicaid recipients who receive behavioral health

and/or developmental disability services through the State of North Carolina. K.C. Compl. ¶ 1 [DE-

6]; DTM Am. Compl. ¶ 1 [DE-7]. Accordingly, the court considers the relevant factual allegations

---

[1] As the court advised at the hearing, Plaintiffs' motion has been referred to this court for determination in accordance with 28 U.S.C. § 636(b)(1)(A). *See* [DE-85]; Local Civil Rule 72.3(b).

of the DTM case followed by the allegations in the instant matter.

A.    **The *DTM* Case**[2]

On May 19, 2008, three minor plaintiffs ("DTM plaintiffs") brought suit against the Secretary

of the North Carolina Department of Health and Human Services ("DHHS") pursuant to 42 U.S.C.

§ 1983 on behalf of themselves and other similarly-situated North Carolina Medicaid recipients

asserting defendant violated their rights under (1) the Due Process Clause of the Fourteenth

Amendment and (2) Title XIX of the Social Security Act, 42 U.S.C. § 1396 ("the Medicaid Act").

DTM Am. Compl. ¶¶ 160-61, 163.  The class action complaint is brought on behalf of all current

or future North Carolina Medicaid recipients who have or will have their claims for behavioral health

or developmental services denied, delayed, interrupted, terminated or reduced by DHHS or its agent.

*Id*. ¶ 13.

DTM plaintiffs allege that beginning July 2006, DHHS and its agent, ValueOptions ("VO"),[3]

have denied, reduced and terminated coverage of medical necessary services to thousands of North

Carolina Medicaid recipients and that the decision to deny, reduce or terminate benefits is made

based upon unpromulgated guidelines.  According to the amended complaint, the defendant has

failed to (1) make decisions on requests for services with reasonable promptness, *id*. ¶¶ 55, 112, 127,

143, (2) issue timely and adequate written notices when requests were denied, reduced or terminated,

*id*. ¶¶ 55, 58, 60, 79, 84, 114, 118, 129, (3) provide for continued services at prior levels pending

appeal, *id*. ¶¶ 39, 143, 150, (4) decide appeals in a timely manner, *id*. ¶ 147 and (5) allow for a fair

---

[2] Record and docket entry citations are to the present case unless denoted otherwise.

[3] VO is a private company with which DHHS is alleged to have contracted to administer behavioral health or developmental disability services for North Carolina's Medicaid recipients. DTM Am. Compl. ¶ 1.

2

hearing, *id*. ¶¶ 148, 150.

Among other forms of relief, DTM plaintiffs seek a declaratory judgment that defendant's failure to provide behavioral health and developmental disability services under Medicaid violates plaintiffs' rights under the Due Process Clause and the Fourteenth Amendment to United States Constitution and the Medicaid Act, 42 U.S.C. § 1396a(a)(3). *Id*. ¶ 2. DTM plaintiffs also seek injunctive relief that defendant be ordered to continue providing behavioral health and disability services to all persons who have been receiving them until defendant corrects the alleged wrongful practices and procedures, and prospectively reinstate behavioral health and developmental services previously provided to the named plaintiffs and members of the class that were improperly denied.

Initially, the DTM plaintiffs' record of counsel consisted of Douglas Sea ("Sea") of Legal Services of Southern Piedmont, Martha Jane Perkins ("Perkins") and Sarah Jane Somers of National Health Law Program. On March 16, 2009, the court entered an order denying defendant's motion to dismiss with prejudice and denying without prejudice plaintiffs' motion for class certification. In its order, the court allowed DTM plaintiffs to refile the class certification motion following discovery of matters relevant to the issue of class certification. Thereafter, the case was stayed pending the appeal of the court's order denying defendant's motion to dismiss. During the stay, attorney Reid C. Adams, Jr. ("Adams"), Murray G. Greason, III ("Greason"), and David J. Mazza ("Mazza") (collectively, "the Firm Attorneys") joined plaintiffs' counsel in *DTM* following email contact between Perkins and Adams.[4] ███████████████████████████████████

---

[4] Perkins contacted Adams, whose practice focuses on large class actions, and inquired of the Firm's interest in the case and advised that ████████████████████████████████████████ ███████████████████████████████████████████████ On July 8, 9 and 13, 2010, attorneys Mazza, Adams and Greason, respectively, entered their appearance as counsel of record in *DTM* on behalf of named



⬛⬛⬛[5] Thereafter, the Firm began an investigation to locate potential class members in the event

the case were remanded. ⬛⬛⬛⬛ The Firm's role was to contact medical providers, assist

in gathering supporting documents and declarations, and assist with discovery upon remand. ⬛⬛s

⬛⬛⬛⬛ The Firm was engaged to assist DTM plaintiffs and counsel with the

factual investigation and to develop evidence and class members for class certification. ⬛⬛

⬛⬛⬛.[6] According to the Firm Attorneys, no one at the Firm had

a role in developing legal theories or strategy in *DTM*. ⬛⬛⬛

Subsequently, the parties reached a settlement and filed the settlement agreement with their

joint motion to approve the agreement. *DTM* [DE-82]. The terms of the settlement commit DHHS

to implement several changes to the procedures regarding medicaid-reimbursable behavioral health

and/or developmental disability services which are subject to prior approval. *Id*. [DE-82-1 at 3-6].

According to the agreement, implementation of the changes "will begin as soon as court approval

is obtained" but "[t]he parties recognize that the [changes] will not be implemented all at once, but

will be implemented over varying time periods." *Id*. [DE-82-1 at 7]. Furthermore, in the event

---

plaintiffs and all others similarly situated.

[5] The affidavits filed by Adams, Greason and Mazza and certain attachments thereto have been sealed as they contain communications regarding *DTM* protected under the work-product doctrine. *See* Order (Dec. 29, 2011) [DE-84].

[6] Mazza, whose practice focuses on electronic discovery and large-scale document review, collection and production, attended the Rule 26(f) discovery conference at which his role was to discuss issues relating to electronic discovery. ⬛⬛⬛. He discussed the Firm's role of managing and reviewing discovery documents once the case was remanded. ⬛⬛⬛ Settlement was discussed at the Rule 26(f) conference. ⬛⬛⬛. Following the conference and subsequent meetings at the Firm's office, which were unattended by Firm personnel, the parties entered a settlement agreement on October 14, 2010. ⬛⬛⬛

4

changes are not implemented, the settlement agreement is voidable by either party and the case shall be returned to active status on the court's docket. *Id.* [DE-82-1 at 8]. The agreement provides further for the dismissal of *DTM* with prejudice upon court approval of the settlement agreement and upon the verification of the changes outlined in the agreement. *Id.* [DE-82-1 at 10].[7]

On November 10, 2010, upon motion by all counsel of record, the court entered an order approving the settlement agreement reached by the parties. *DTM* [DE-91]. The court directed the case be removed from the court's active docket. In its order, the court concluded as a matter of law that "[p]laintiffs' counsel has provided services to the minor children consistent with their role as attorneys to these children." *Id.* at 4.

On or about November 11, 2010, the Firm Attorneys received an email from Sea advising that the court had approved a settlement agreement in *DTM* and ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████. Based on the settlement and the email, the Firm Attorneys understood the Firm's involvement with *DTM* to have ended. ███████████████████ ███████████.

During work on *DTM*, the Firm Attorneys never met nor spoke directly with any of the named plaintiffs or unnamed class members. ████████████████████████████████.

---

[7] The implementation of the agreed-to changes by the defendant is currently ongoing. According to the agreement, the defendant must provide plaintiffs' counsel with written notice verifying the changes have been implemented. [DE-82-1 at 4-6]. Certification by the defendant that all changes have been made shall be followed by a six month period of monitoring to ensure compliance. *See id.* at 7.

To their knowledge, no one at the Firm has met or spoken directly with any of the unnamed class members in *DTM* nor has anyone at the Firm received any information confidential or otherwise from any class member in *DTM*. ████████████████████████████████████████████.

Furthermore, the Firm Attorneys never discussed with Perkins or Sea what role the Firm would play in *DTM* if the conditions of settlement were not met and litigation resumed. ████████████

████████████████████████████ The Firm Attorneys have not shared any confidential information about *DTM* with anyone on the *K.C.* litigation team nor have they learned of any confidential information about the present case. ████████████████████████████████

████ According to Sea, the Firm "promised to play a significant role in the discovery process [in *DTM*]" and "has already played a significant role in the development of evidence concerning the multiple allegations in the complaint and has promised to continue doing so if the litigation continues." Affidavit of Douglas Sea ("Sea Aff.") [DE-30] ¶ 8.[8]

If DTM litigation resumes, the Firm will likely seek to withdraw as counsel in that case on the grounds that the motion to disqualify in the present case and other related events make it very uncomfortable for the Firm to work with counsel any further in *DTM*. ████████████████████████

████████████████████

_____

[8] At the hearing, Sea informed the court that the Firm has had access to confidential information from class member medical providers regarding the DTM plaintiffs' needs for Medicaid services and whether they suffer harm as a result of the loss of medical services. [DE-85 at 22]. Sea advised further that lawyers for the Firm worked on the factual investigation of the DTM plaintiffs' claims and that he and Perkins participated in training sessions with the Firm lawyers, not all of whom have provided affidavits to the court, and that during these training sessions, Firm personnel were provided access to confidential work product regarding strategy for proving their case. *Id.* at 23-24. Sea told the court further that lawyers for the Firm also participated in conference calls to discuss strategy. *Id.* at 24.

**B.      The K.C. Case**

On July 5, 2011, Plaintiffs filed suit against Lanier Cansler ("Cansler"), Secretary of the DHHS, its Medicaid Managed care contractor and agent, Piedmont Behavioral Healthcare ("PBH")[9] and its area director Pamela Shipman ("Shipman") (collectively "Defendants") pursuant to 42 U.S.C. § 1983 on behalf of themselves and others similarly situated asserting Defendants violated their rights under (1) the Due Process Clause of the Fourteenth Amendment and (2) the Medicaid Act. Compl. ¶¶ 127-34 [DE-6]. The class action complaint is brought on behalf of all current or future North Carolina Medicaid recipients who are developmentally disabled who have or will have their claims for behavioral health or developmental services denied, delayed, interrupted, terminated or reduced by Defendants. *Id*. ¶¶ 2, 24.

Plaintiffs have received developmental disability services through the North Carolina Innovations Waiver program ("Waiver program"), which is operated by PBH. *Id*. ¶ 2. The Waiver program is subject to the Medicaid Act, including 42 U.S.C. § 1396a(a)(3), and the due process clause of the United States Constitution. *Id*. ¶ 7. PBH is contracted by DHHS to "manage all publicly funded [mental health, developmental disability and substance abuse] services" within its catchment area, which at the time of the filing of the instant matter, included the North Carolina counties of Davidson, Rowan, Cabarrus, Union and Stanley. *Id*. ¶ 21; *See* Affidavit of Pamela L. Shipman ("Shipman Aff.") ¶ 3 [DE-41]. PBH has since expanded its service area to include Alamance, Caswell, Franklin, Granville, Halifax, Vance and Warren counties. Sea Aff. Ex. D [DE-30-4].

---

[9] PBH is a managed care behavioral health organization and through federal and state funding, manages the provision of Medicaid services to individuals with developmental disabilities, substance abuse and mental health needs. Compl. ¶ 21.

7

Plaintiffs allege PBH reduced, denied or terminated services through the application of a new system (the "Supports Needs Matrix" or "the Matrix") effective July 1, 2011 without due process.[10] Plaintiffs assert three causes of actions: (1) the matrix is an arbitrary and non-ascertainable standard and Defendants' use of the matrix is inconsistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (2) Defendants have failed to allow an opportunity for a fair hearing to those whose Medicaid benefits have been denied, reduced, terminated or not acted upon with reasonable promptness, all of which violate 42 U.S.C. § 1983 and 42 U.S.C. § 1396a(a)(3) of the Medicaid Act, and (3) Defendants have violated the Fourteenth Amendment to the United States Constitution by denying participants in the Waiver program timely notice and an opportunity for a fair hearing prior to reduction or termination of benefits, by failing to notify Waiver program participants of their appeal rights and by discouraging participants from exercising their appeal rights. Compl. ¶¶ 123-134.

On July 5, 2011, Wilder, a member of the Firm entered an appearance as counsel of record on behalf of PBH and Shipman. Aff. of Raboteau T. Wilder, Jr., ("Wilder Aff.") ¶¶ 2, 3 [DE-46]. Sea, Plaintiffs' counsel, contacted Wilder advising he believed the Firm had a conflict of interest in representing PBH and Shipman as a result of the Firm's work in *DTM*. Wilder Aff. ¶ 4; Sea Aff. ¶ 12. Upon receipt of Wilder's notice that the Firm would not withdraw as counsel for PBH and Shipman, Sea contacted the North Carolina State Bar and warned the Firm that "a formal grievance with the [State Bar] is being filed shortly" on behalf of counsel and Plaintiffs. Pls.' Mot. to

---

[10] Under the matrix, PBH assigns a score to each participant based on his/her assessed needs, then places each participant into a matrix category which determines the amount of service funding each participant receives under the Waiver program. Compl. ¶ 3.

Disqualify Counsel ¶¶ 12, 21 ("Pls.' Mot.") [DE-27]; Sea Aff. ¶ 12.[11]

In an affidavit, Wilder states that "[a]s a result of [the] alleged conflict issue, the Firm has implemented an ethical screen on July 7, 2011 between the team intending to represent PBH and Ms. Shipman in this case and the team that had represented the plaintiffs in the DTM Case." Wilder Aff. ¶ 5. According to the affidavit, the ethical screen is designed to protect confidential information of the clients in the respective matters and ensure that no confidential information is exchanged between the two teams. *Id.* Wilder states that he has not "shared any confidential information about the current case with anyone on the DTM team" and he has not "learned any confidential information about the DTM case." *Id.* ¶ 16. Wilder states that based on his knowledge and understanding of *DTM*, the ethical screen, and the issues raised in the present case, it is his belief "that the ethical screen has been effective in preventing the exchange of any confidential information about these two cases." *Id.* In an exhibit to Wilder's affidavit, Wilder identifies several employees of the Firm who either had a role in *DTM* or have a role in the present case. *See* Wilder Aff., Ex. A at 3-4 [DE-46.1]. In particular, twenty-three individuals are identified as having a role in *DTM*, twelve of whom counsel has advised are attorneys, while eight persons are identified in the exhibit as having a role *K.C.*, including Wilder. *Id.*; [DE-85 at 31].

## II. APPLICABLE LAW

The disqualification of counsel is decided on a case-by-case basis. *Rogers v. Pittston Co.*, 800 F. Supp. 350, 353 (W.D. Va. 1992), *aff'd* 996 F.2d 1212 (4th Cir. 1993); *Superguide Corp. v. DirecTV Enter., Inc.*, 141 F. Supp. 2d 616, 621 (W.D.N.C. 2001) (citing *Plant Genetic Sys., N.V. v.*

---

[11] This court has not been advised further of any bar grievance, including the substance of any such grievance, or any investigation or findings of the North Carolina State Bar regarding the circumstances that have been presented to the court.

9

*Ciba Seeds*, 933 F. Supp. 514 (M.D.N.C. 1996)).  The Fourth Circuit has disapproved of the "mechanical and didactic" application of attorney disciplinary rules and instead instructed that the court should focus on the harm to the parties before the court.  *See Aetna Casualty & Surety Co. v. United States*, 570 F.2d 1197, 1202 (4th Cir. 1978); *Capacchione v. Charlotte-Mecklenburg Bd. of Educ.*, 9 F. Supp. 2d 572, 579 (W.D.N.C. 1998) (citation omitted).  Disqualification is a serious proposition "which cannot be based on imagined scenarios of conflict, and the moving party has a high standard of proof to meet in order to prove that counsel should be disqualified." *Ciba Seeds*, 933 F. Supp. at 517 (citing *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F. Supp. 724, 729 (E.D. Va. 1990)); *Capacchione*, 9 F. Supp. 2d at 579 (observing that "no ethical canon can be an all-encompassing bright-line rule that will easily apply to all circumstances no matter the facts of the individual case") (citation omitted); *Shaffer v. Farm Fresh, Inc.*, 966 F.2d 142, 145 (4th Cir. 1992) (observing that "disqualification of a litigant's chosen counsel for violation of an ethical canon . . . may not be rested on mere speculation that a chain of events whose occurrence theoretically could lead counsel to act counter to his client's interests might in fact occur.") (citing *Aetna*, 570 F.2d at 1200-02).

In close cases, however, the trial court "should not engage in 'hair splitting' niceties but instead resolve all doubts in favor of disqualification." *Ciba Seeds*, 933 F. Supp. at 517; *see Rogers*, 800 F. Supp. at 353 (explaining a requirement that the movant demonstrate the actual sharing of confidences would indulge hairsplitting; rather all doubts should be resolved in favor of disqualification).  In considering a motion to disqualify counsel, the court must balance (1) the right of a party to retain counsel of its choice and (2) the substantial hardship that may result from disqualification against the public perception of and the public trust in the judicial system.  *See Ciba*

*Seeds*, 933 F. Supp. at 517; *see Capacchione*, 9 F. Supp. 2d at 579 (citing *Shaffer*, 966 F. 2d at 146).

Stated differently, "[t]he guiding principle in considering a motion to disqualify counsel is safeguarding the integrity of the court proceedings" and "the purpose of granting such motions is to eliminate the threat that the litigation will be tainted." *Ciba Seeds*, 933 F. Supp. at 517; *see Capacchione*, 9 F. Supp. 2d at 579 (citation omitted); *see Tessier*, 731 F. Supp. at 729 (noting right to retain counsel of one's choosing is "secondary in importance to the Court's duty to maintain the highest ethical standards of professional conduct to insure and preserve trust in the integrity of the bar").

### III. DISCUSSION

Plaintiffs contend the Firm's representation of PBH and Shipman creates a conflict of interest in violation of Rules 1.7(a)(2) and 1.8(b)[12] of the North Carolina Rules of Professional Conduct ("RPC") requiring the Firm to withdraw from the present case. Pls.' Mot. ¶¶ 13-17; Pls.' Reply Supp. Mot. Disqualify Counsel at 9 ("Pls.' Reply") [DE-48].[13] Plaintiffs argue a substantial amount

---

[12] Rule 1.7(a) prohibits a lawyer from representing a client where a concurrent conflict of interests exists (except as provided in paragraph (b)). The rule provides that a concurrent conflict of interest exists, *inter alia*, if:

> (2) the representation of one or more clients may be materially limited by the lawyer's responsibilities to another client, a former client, or a third person, or by a personal interest of the lawyer.

Rule 1.8(b) provides that "[a] lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules."

[13] The local rules of practice in the Eastern District of North Carolina provide in relevant part that "[t]he ethical standard governing the practice of law in this court is the Revised Rules of Professional Conduct, now in force and as hereafter modified by the Supreme Court of North Carolina, except as may be otherwise provided by specific rule of this court." Local Civil Rule 83.1(j).

of confidential work product has been shared with the Firm Attorneys and staff in *DTM* – an active case whose plaintiffs are owed a continuing duty by the Firm – that is relevant to the present case. *Id.* ¶ 13(a), (d). In particular, Plaintiffs contend there is significant "overlap" between the class of plaintiffs in *DTM* and the present case and that the two cases are closely related legally and factually. *Id.* ¶ 13(e)(f). In light of the alleged overlap between *DTM* and *K.C.* and the belief that the Firm's representation of its *DTM* client is adverse to the Firm's clients in the instant matter, Plaintiffs argue the Firm cannot effectively advocate simultaneously on behalf of their clients in either case. *Id.* ¶ 15. Plaintiffs argue further that the RPC do not permit an "internal screen" or ethical screen to obviate a conflict of interest. *Id.* ¶ 13(g). Finally, Plaintiffs assert that if the Firm follows through on its stated inclination to withdraw as counsel in *DTM*, the interests of the DTM plaintiffs will be substantially prejudiced. *Id.* ¶ 13(b)(c).

A. **There is a significant risk that the Firm's representation of PBH and Shipman in the present case will materially limit its representation of the DTM plaintiffs.**[14]

The North Carolina Rules of Professional Conduct provide that

> Ordinarily a lawyer may take inconsistent legal positions in different tribunals at different times on behalf of different clients. The mere fact that advocating a legal position on behalf of one client might create precedent adverse to the interests of a client represented by the lawyer in an *unrelated matter* does not create a conflict of interest.

---

[14] The parties devote significant argument to the duty, if any, owed to unnamed members of a putative class in *DTM*. Plaintiffs contend the Firm owes a fiduciary duty to unnamed putative class members. Defendants contend that (1) there is no traditional attorney-client relationship with unnamed class members and (2) the Firm does not need the consent of unnamed class members if *DTM* and *K.C.* are unrelated. [DE-85 at 36]. However, deciding whether the cases are related will determine duties owed the unnamed plaintiffs in the putative *DTM* class. *See* Comment 25 to RPC 1.7; *see In re Fine Paper Antitrust Lit.*, 617 F.2d 22, 24-25 (3d Cir. 1980) (finding mere membership of defendant in a plaintiff class action represented by counsel in one proceeding was not sufficient grounds to disqualify same counsel in unrelated suit).

12

Comment 24 to RPC 1.7 (emphasis added). Plaintiffs argue, however, that *K.C.* and *DTM* are <u>related</u>

and thus the Firm cannot take conflicting legal positions arising from its representation of the

plaintiffs in *DTM* and Defendants in the instant case absent consent of the affected clients.[15] Pls.'

Reply at 4-5. In support of this position, Plaintiffs note that Comment 24 instructs further that "[a]

conflict of interest exists . . . [] when there is a significant risk that a lawyer's action on behalf of one

client will *materially limit* the lawyer's effectiveness in representing another client in a different

case." Comment 24 to RPC 1.7 (emphasis added).[16] The comment provides the following factors

to be considered in making this determination: (1) whether the cases are pending, (2) whether the

issue is substantive or procedural, (3) the temporal relationship between the matters, (4) the

significance of the issue to the immediate and long-term interests of the clients involved and the

clients' reasonable expectations in retaining the lawyer. *Id.*

　　While the RPC do not define "relatedness," the issue of whether two matters are

"substantially related" has been considered by courts in this circuit on motions to disqualify counsel

upon alleged ethical grounds where the movant contends a party's representation of a current client

is materially adverse to that of a <u>former</u> client.[17] Mindful of the Fourth Circuit's disapproval of the

---

[15] There is no evidence the Firm's clients have provided informed consent to the alleged conflict of interest.

[16] There is no dispute that a conflict of one attorney within the Firm may be imputed to another. Rule 1.10 extends the reach of Rule 1.7 and prohibits lawyers associated with a firm from "knowingly representing a client when any one of them practicing alone would be prohibited from doing so by Rule[] 1.7. . .."

[17] In particular, in determining whether an attorney should be disqualified from representing a current client as a result of his representation of a former client, the party moving to disqualify counsel must establish: (1) an attorney client relationship existed with the former client and (2) the former representation is substantially related to the current controversy. *Superguide Corp.*, 141 F. Supp. 2d at 621; *Capacchione*, 9 F. Supp. 2d at 578; *Ciba Seeds*, 933 F. Supp. at 517 (citing *Rogers*,

"mechanical and didactic" application of the RPC, the court turns to case law for guidance in determining whether *DTM* and *K.C.* are "unrelated." To that end, matters have been found to be substantially related if there is a "virtual congruence of issues," and the relationship between the issues is "patently clear." *Ciba Seeds*, 933 F. Supp. at 518 (citation omitted). However, "it is not necessary that the two lawsuits involve the same operative facts, so long as there is a sufficient similarity of issue." *Id*. (citing *Buckley v. Airshield Corp*., 908 F. Supp. 299, 304 (D. Md. 1995)); *see also Blumenthal Power Co. v. Browning-Ferris, Inc*., 903 F. Supp. 901, 902 (D. Md. 1995)(explaining "the 'substantial relationship' test focuses upon the factual nexus between the earlier representation and the present, adverse representation"). As explained below, upon considering case law's interpretation of "substantially related," as well as the RPC factors outlined above, the court finds there is a significant risk that the Firm's action on behalf of PBH and Shipman in the instant matter will materially limit its effectiveness in representing the DTM plaintiffs.

    1. <u>*DTM* and *K.C.* litigation is not unrelated</u>.

While the contractor for the Medicaid agency in the two cases is indeed different, the underlying substantive issues of whether Defendant Cansler authorized or permitted these practices by its contractors, whether the practices are legal, whether and how the practices can cause harm to Medicaid recipients with developmental disabilities, and what level of proof of the practices is needed to justify relief are the same. First, *K.C.* and *DTM* concern similar factual allegations, as illustrated by the following examples, yet the Firm takes contradictory legal positions. Sea Aff. Ex. E [DE-30-5].

---

800 F. Supp. at 353-54).

(1)     In *K.C.*, Plaintiffs allege Defendants have a practice and policy of instructing participants and providers of arbitrary limits on the total cost of services that may be requested. In particular, Plaintiffs allege PBH has advised participants their plan of care may not request more services than the Matrix allows. K.C. Compl. ¶ 110. Similarly, in *DTM*, plaintiffs allege defendant has a practice of applying arbitrary and improper limits on the number of hours a service may be requested and that VO has informed providers that they may not request more services than were previously approved. DTM Am. Compl. ¶ 118.

(2)     In *K.C.*, Plaintiffs allege PBH discourages requests for services and appeals of its decisions reducing or terminating services by threatening participants. K.C. Compl. ¶ 111. In *DTM*, plaintiffs allege defendant has encouraged providers and participants to withdraw or modify requests for services. DTM Am. Compl. ¶ 120.

(3)     In *K.C.*, Plaintiffs allege Defendants have a practice of encouraging participants not to file requests for review and not to file a plan of care in excess of the matrix budget maximum. Plaintiffs allege Defendants thereby verbally deny, reduce and terminate services without issuing a written notice and without permitting appeal. K.C. Compl. ¶ 112. In *DTM*, plaintiffs allege defendant discouraged requests for services and appeals of its decisions to reduce or terminate services by improperly threatening providers. DTM Am. Compl. ¶ 119.

(4)     In *K.C.*, Plaintiffs allege Defendants engage in a policy and practice of reducing or terminating services despite any material change in the participant's medical condition and without giving adequate explanation of the change in its decision, even though the period for which services were previously authorized has not expired. K.C. Compl. ¶ 114. In *DTM*, plaintiffs allege defendant has a practice of failing to make medical necessity decisions based on the individual facts of the case but rather upon unpromulgated guidelines about the number of hours permitted for a requested service or what requirements must be met to qualify for the services. DTM Am. Compl. ¶ 125.

(5)     The plaintiffs in both cases allege that DHHS has a policy of failing to issue timely and adequate written notices when requests for services are denied, reduced or terminated. K.C. Compl. ¶ 115; DTM Am. Compl. ¶ 129. Plaintiffs in both cases also allege that DHHS has a policy and/or practice of failing to provide adequate explanation for the reasons of its decision to written notices to participants. K.C. Compl. ¶ 116; DTM Am. Compl. ¶ 137.

15

(6)      In *K.C.,* Plaintiffs allege Defendants have a practice of issuing notices that improperly state services are being initially denied when in fact services are being reduced or terminated and which fail to indicate the participant has a right to continued services pending an appeal.   After the participant has appealed a decision by PBH to reduce or terminate services, Defendants engage in a practice of failing to authorize with reasonable promptness and for the entire period at issue for the provider to continue to provide services to the participant pending the outcome of the appeal.   K.C. Compl. ¶¶ 117, 118.   In *DTM*, plaintiffs allege defendant has engaged in a practice of issuing notices that fail to identify whether the services are being initially denied or terminated and to indicate whether the participant has a right to continued services pending appeal. DTM Am. Comp. ¶ 139.  DTM plaintiffs contend further that defendant engages in a practice of failing to timely and consistently provide authorization for providers to continue to provide services to participants.  *Id*. ¶ 128.

(7)      In *DTM*, the Firm must argue that due process requires Defendant Cansler and his agents to assure that their employees do not discourage Medicaid recipients from requesting prior approval of Medicaid services or appeals. In *K.C.*, the Firm must argue the contrary position. *Cf.* Sea Aff. Ex. C ¶ 118-120 [DE-30-3] *with* PBH Ans. ¶¶ 52, 53, 55, 59, 60, 112-114 [DE-38].

(8)      In *DTM*, the Firm contends due process requires that Medicaid services continue pending the outcome of an appeal even if the previously authorized period has expired.  The Firm, however, has taken the contrary legal position in this case. *Cf.* Sea Aff. Ex. C ¶¶ 143-44 [DE-30-3] *with* PBH Ans. ¶¶ 3, 60, 119, 120 [DE-38].

(9)      In *DTM*, the Firm's position is that before Medicaid services are terminated or reduced, due process requires a written notice specifying the factual reason for the decision that is understandable to the Medicaid recipient.   In the instant matter, however, the Firm has denied almost identical allegations. *Cf.* Sea Aff. Ex. C ¶¶121, 135, 136 [DE-30-3] *with* PBH Ans. ¶¶117-119 [DE-38].

(10)     In *DTM*, the Firm contends the use of unpublished, internal criteria to determine eligibility for Medicaid services violates due process; yet, the Firm has denied the same claim in this case. *Cf.* Sea Aff. Ex. C ¶¶118, 125 [DE-30-3] *with* PBH Ans. ¶¶1, 121, 125 [DE-38].

Second, the Firm has raised legal defenses in the present case which, if successful, would

directly prejudice the interests of its clients in *DTM*.  For example, the Firm will seek to prove in

16

*DTM* numerous alleged practices which are very similar to practices alleged in this case which PBH has already denied. *Cf.* Compl. [DE-6] and Sea Aff. Ex. C. (the DTM Am. Compl.) [DE-30.3] *with* PBH Ans. [DE-38]. Additionally, in its Answer, PBH has asserted the affirmative defenses of lack of standing due to absence of an injury in fact and of failure to exhaust administrative remedies. PBH Ans. at 29-30 [DE-38] . In *DTM*, the same defenses were raised by Defendant Cansler in a motion to dismiss and subsequently denied by the court as to both issues. However, Defendant Cansler will have the right to again raise those defenses in an appeal of any final judgment against him by the district court in that case.

Third, the Firm must take contradictory discovery positions. In particular, in *DTM*, the Firm will have a duty to seek discovery regarding Defendant Cansler's supervision of his contractors and of his instructions to them regarding the prior approval of Medicaid services and notice and hearing rights. However, in *K.C.*, the Firm will have a duty to seek to limit such discovery. This discovery conflict is especially significant given that in each case, the plaintiffs challenge the same alleged tactics used by defendants in denying or reducing benefits and program participants' appeal rights. Fourth, the Firm must take a position as to class certification in *K.C.* which conflicts with its *DTM* position. In particular, in *DTM*, the Firm must argue that the requirements for class certification are met; however, despite similar factual scenarios, in *K.C.*, the Firm contends those requirements are not met. *Cf.* Sea Aff. Ex. C. ¶¶13-19 [DE-30.3] *with* PBH Ans. ¶¶ 24-31, 108-09 [DE-38].

   2.   Exposure of the Firm to client confidences

In addition to considering whether there is a sufficient similarity of issue, courts have held that "[i]n determining whether the two cases are substantially related,' the court must decide whether the attorney could reasonably have been exposed to client confidences in the former case." *Rogers*,

800 F. Supp. at 353. "Where the matters are determined to be substantially related, and there was a reasonable chance that the attorney received confidences in the first matter, an irrebuttable presumption arises that confidences were exchanged." *Id*. at 354 (citation omitted). Other courts have held "that once an attorney-client relationship has been established, an irrebuttable presumption arises that confidential information was conveyed to the attorney in the prior matter." *Tessier*, 731 F. Supp. at 724; *see also Superguide Corp.*, 141 F. Supp. 2d at 623 (stating "it is naive to assume that, despite scrupulous integrity, [counsel] would not unconsciously use such knowledge in th[e] [present] litigation") (citation omitted). However, "no actual receipt of confidences must be shown" – rather "[t]he [c]ourt is concerned with the possibility rather than actuality." *Buckley*, 908 F. Supp. at 306 (citing *Rogers*, 800 F. Supp. at 354); *Tessier*, 731 F. Supp. at 732 (stating an actual conflict need not be found before a motion to disqualify is granted). In the particular context of this case, the relevant question therefore is whether confidential information assumed to have been shared with the Firm in *DTM*, an ongoing case, may be used by the Firm in the present case to the detriment of the DTM plaintiffs.

The Firm has been retained to assist with the factual investigation and to develop evidence with respect to *DTM* class members. The Firm describes its role in *DTM* as one of contacting medical providers, gathering supporting documents and declarations. One attorney participated in the discovery conference and it appears multiple Firm personnel participated in "training sessions" with Sea and Perkins in which the case was discussed and personnel had access to medical documentation. Although the Firm would dispute the significance of these contacts with its co-counsel, it is reasonable to conclude that over the course of several months representing the DTM plaintiffs, the Firm could have been exposed to client confidences. It is reasonable further to

18

conclude that the information learned by the Firm related to exploring the viability of the DTM plaintiffs' claims, medical proof and the plaintiffs' actual loss, and that this information would be helpful in the present case defending against similar factual and legal allegations that PBH and Shipman wrongly denied services under similar Medicaid schemes. That *DTM* has been removed from the court's active docket pending consummation of all settlement terms does not remove the prospect of conflict from real to imagined. Indeed, the terms of the settlement agreement contemplate active litigation upon the failure of implementation of the agreed-to changes to the Medicaid program.[18]

3.    RPC Factors

Finally, the factors identified in Comment 24 to RPC 1.7 weigh in favor of finding that clients should be advised of the risk of conflict. *See* Comment 24 to RPC 1.7. First, although complaint allegations in *DTM* and the present case cover distinct periods of time, each case is pending in this federal court. Second, the Firm's representation in *DTM* has been to date more than procedural and its representation of PBH and Shipman in the instant matter will certainly involve substantive and procedural issues if not already. Finally, the positions taken by the Firm in *DTM* and in the present case are significant to the immediate and long-term interests of the clients involved

_____

[18] To the extent the Firm points to Sea's email as a basis upon which to argue its role in *DTM* has been concluded, the communication is less than unequivocal. ████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████ Indeed, the settlement agreement requires defendant provide written notice of its compliance to plaintiffs' counsel, counsel which includes the Firm. *DTM* [DE-82-1 at 4-6].

and the clients' reasonable expectations in retaining the lawyer.[19]

### B. The ethical screen imposed by the Firm is not sufficient to alleviate concerns regarding breaches of confidentiality.

As an alternative to disqualification, Defendants argue that the Firm's ethical screen has been effective in preventing the exchange of any confidential information about *DTM* and the present case. Defs.' Mem. at 24. Defendants argue further that some courts have looked upon with favor

---

[19] Defendants argue that because *DTM* and the present case purport to be class actions, the RPC cannot be mechanically applied and that a more appropriate means of addressing a motion to disqualify is through the application of several factors:

> [t]he information in the attorney's possession, the availability of the information elsewhere, the importance of this information to the disputed issues, actual prejudice that would flow from the attorney's possession of the information, the cost to class members obtaining new counsel and the ease with which they might do so, the complexity of the litigation, and the time frame needed for new counsel to familiarize himself with the case.

Defs.' Mem. at 11-12 .

Defendants offer no further explanation as to the applicability of these factors to the circumstances in the present case. The court observes the test urged appears more appropriate for the settlement of class actions. *See In re Agent Orange Prod. Liab. Lit.*, 800 F.2d 14, 19 (2nd Cir. 1986) (concluding that the traditional rules governing disqualification outside the class action context should not be mechanically applied to problems that arise in settlement of class action.); *Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 590 (3d Cir. 1999); *In re Corn Derivatives Antitrust Lit.*, 748 F.2d 157, 162 (3d Cir. 1984); *but see Dean v. Kraft Foods N. Am., Inc.*, No. 02-8609, 2004 U.S. Dist. LEXIS 5491, at *7, 2004 WL 614588, at *2-3 (E.D. Pa. Mar 26, 2004) (considering the factors "to the extent they apply" outside the context of class action settlement). The focus of these factors is prejudice to the party seeking disqualification versus the cost of securing new counsel. *See Dean*, 2004 U.S. Dist. LEXIS 5491, at *6, 2004 WL 614588, at *2 (citing *Corn Derivatives*).

Moreover, application of these factors weighs in favor of Plaintiffs. For example, PBH and Shipman already have other counsel of record in the present case and this counsel has taken an active role on behalf of PBH and Shipman. The case is relatively young with major issues such as class certification not yet decided. As previously addressed, the Firm has had extensive contact with DTM plaintiffs and the two pending cases are related. *See Dean*, 2004 U.S. Dist. LEXIS 5491, at *6, 2004 WL 614588, at *3 (denying motion to disqualify noting minimal contact with firm sought to be disqualified and absence of factual or legal relationship between the litigation).

the implementation of such conflict-preventive measures as an alternative to disqualify counsel. As counsel correctly points out, in *Capacchione*, in denying a motion to disqualify, the court recognized that the motion to disqualify had prompted counsel's "specific assurances" of their ethical obligation not to discuss the content of communications and the court gave these assurances regarding confidentiality "significant weight." 9 F. Supp. 2d at 582; *see also Shaffer*, 966 F.2d at 146.

This case, however, is materially distinguishable from *Capacchione*. In *Capacchione*, other attorneys at the firm had provided the defendants an "educational briefing" about school desegregation law. The briefing was conducted at an airport, was open to the public and was a general overview of the law. In concluding that the prior work was not substantially related to the current school desegregation case, the court acknowledged that while the firm's "educational briefing" addressed the issue of school desegregation and unitary school systems, it did so generally and never applied the law to the facts. Critical to the court's conclusion, however, is that there was never an attorney client relationship with counsel in the prior work. Indeed, the briefing was open to the public and attended by persons other than the school board. The court held there was no prior attorney-client relationship nor were the two matters substantially related; therefore there was little, if any, prejudice or threat of a conflict developing if the attorneys continued to represent its client. *Capacchione*, 9 F. Supp. 2d at 582. Here, however, the prejudice or threat of a developing conflict is considerably more acute as the Firm is currently the Plaintiffs' attorney of record in *DTM*, a pending matter, and the Firm's work on *DTM* has been more than an "educational briefing."[20]

---

[20] The Firm's duty to DTM plaintiffs is not somehow diminished because (1) the *DTM*, though a pending case, is being held in abeyance, or (2) the Firm contemplates the withdrawal of its representation in that litigation. Even if the court could make its ruling based on speculation as to these outcomes, the Firm would remain bound by its obligations under RPC 1.9 to <u>former</u> clients. Rule 1.9 provides that absent informed consent, a lawyer who has formerly represented a client in

Moreover, the North Carolina Rules of Professional Conduct suggest that ethical screens are not appropriate under the circumstances presently before the court. *See* Comment 8 to RPC 1.0(l) (defining ethical screens as applied in the context of RPC 1.10, 1.11, 1.12 and 1.18); *see also* Douglas J. Brocker, The Expansion of Attorney Conflict Screening, 15 N.C. Bar J. (2003) (discussing circumstances under which ethical screening may be implemented in accordance with recent changes to the North Carolina RPC) [DE-48-2]. Finally, there is strong evidence that the screen has in fact failed to prevent the communication of work product from attorneys working in *DTM* and those working in the present case. *See* Pls.' Renewed Mot. to Place Docs. Under Seal [DE-68] and subsequent Order [DE-84] (Dec. 29, 2011). For these reasons, this court does not have the same assurances as were articulated by the court in *Capacchione* and thus finds that an ethical screen is an ineffective alternative to disqualification under the circumstances.

## IV. CONCLUSION

For the reasons stated above, and cognizant of the drastic nature of the remedy imposed, together with admonition that this court avoid applying attorney disciplinary rules in a didactic and mechanical manner, this court concludes that the right of PBH and Shipman to retain counsel of their choosing must yield to the primary duty of this court to insure and preserve trust in the integrity of the bar. Plaintiffs' motion to disqualify counsel [DE-27] is therefore allowed.

---

a matter is prohibited from representing another person in "the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." RPC 1.9(a). Matters are "substantially related" if they involve the "same transaction or legal dispute or if there otherwise is a substantial risk that information as would normally have been obtained in the prior representation wold materially advance the client's positions in the subsequent matter." *Id*. Comment 3.

So ordered, this the 10th day of January, 2012.

_____
Robert B. Jones, Jr.
United States Magistrate Judge